See also, D.C., 86 F.R.D. 66.

Roger GREENE et al., Plaintiffs,

v.

EMERSONS LTD. et al., Defendants.

No. 76 Civ. 2178–CSH.

United States District Court,
S. D. New York.

Jan. 29, 1980.

Kass, Goodkind, Wechsler & Labaton, New York City, for plaintiffs; Stuart D. Wechsler, Lawrence Sucharow, New York City, of counsel.

Anderson, Russell, Kill & Olick, New York City, for defendant John P. Radnay; Lawrence Kill, Leon B. Kellner, New York City, of counsel.

Lantner & Ouslander, New York City, for defendant Eli Levi.

Greenbaum, Wolff & Ernst, New York City, for defendant United American Food Processors, Inc.; Rudnick & Wolfe, Chicago, Ill., of counsel.

Covington & Burling, Washington, D. C., for defendant Kenneth Leventhal & Co.; Hughes, Hubbard & Reed, New York City, David B. Isbell, Theodore Voorhees, Jr., Kathryn P. Broderick, Washington, D. C., Susan L. Thorner, New York City, of counsel.

## MEMORANDUM OPINION AND ORDER

HAIGHT, District Judge:

This action was commenced by holders of common stock of Emersons Ltd. ("Emersons"), a Delaware corporation which operated 40 limited-menu restaurants in seven eastern states and the District of Columbia. Plaintiffs allege violation by defendants of §§ 10(b), 13 and 14(a) of the Securities Exchange Act of 1934, 15 U.S.C. §§ 78j(b), 78m, and 78n(a), as well as violations of Rules 10b–5, 13a–11 and 14a–9 promulgated thereunder. Jurisdiction and venue are alleged under § 27 of the Act, 15 U.S.C. § 78aa. State law claims are also asserted under principles of pendent and ancillary jurisdiction. The case is now before the Court on (1) plaintiffs' motion under Rule 23, F.R.Civ.P., for class certification; (2) the motion of defendant "outside directors" under Rule 12(b) to dismiss the complaint as to them for failure to state a claim; and (3) the motion of defendant United American Food Processors, Inc. under Rule 12(b) to dismiss the complaint as to it for lack of personal jurisdiction and improper venue.

The motion on behalf of the outside directors is granted for the reasons set forth in a separate memorandum filed concurrently herewith, and an order of dismissal will be entered in their favor. This memorandum addresses the other two motions.

### I.

### CLASS CERTIFICATION

A. *Analysis of the Complaint*

The original complaint in this action was filed on May 13, 1976. It has been twice amended, in part because of reports of special counsel and special auditors, arising out of an SEC investigation into Emersons, which became available in January, 1977. The present motions are addressed to the second amended complaint (hereinafter "the complaint"). The plaintiffs are Roger Greene and Theodore Abbey.[1] Greene alleges that he purchased 500 shares of Emersons' common stock on or about March 4, 1976. Abbey alleges that he purchased a total of 3600 shares in 9 separate transactions, the earliest on August 29, 1973 and the latest on November 13, 1975. Plaintiffs allege that, as the result of the misdeeds described in the complaint, their shares were acquired at an artificially inflated price. The defendants are Emersons; John P. Radnay and Eli Levi, former officers and "inside directors" of Emersons; Ralph W. Emerson, James M. Allen, Edward A. Friedman, Keith B. Smith, and Robert B. Gabbe, "outside directors"; Kenneth Leventhal & Company, Emersons' accountants ("Leventhal"); and United American Food Processors, Inc., one of Emersons' suppliers ("United American").

The complaint (¶ 3) defines the putative class as those:

". . . who purchased shares of the common stock of defendant Emersons Ltd. on or after January 1, 1972 and before April 7, 1976, the date the Securities and Exchange Commission suspended trading in Emersons' common stock."

In their reply brief on the motion for certification (p. 4), plaintiffs state their intention to amend the class designation so that it will embrace the following:

"All persons who purchased the common stock of Emersons on or after January 29, 1973 through April 7, 1976, the date the Securities Exchange Commission suspended trading in Emersons common stock, except defendants herein, their affiliates, members of their immediate family, or persons who were directors, officers, partners, managerial or supervisory

---

1. A third original plaintiff, David G. Walker, has been dismissed from the action on consent.

employees or agents of any of the defendants herein."

The principal effect of the amendment is to shorten the class period: it commences on January 29, 1973, rather than January 1, 1972. Plaintiff's explanation lies in the fact that Emersons' 1972 financial statement, the first in a series of documents of which they complain, was not filed with the SEC and distributed to the public until late January of 1973.

Plaintiffs' theory, in essence, is that during the class period, defendants entered into a common course of fraudulent conduct, with the objective and effect of artificially inflating the price of Emersons' stock, to the detriment of the class members.

The complaint sets forth the acts and omissions upon which plaintiffs rely, broken down as to the separate defendants. For the sake of the present discussion, however, it is more illuminating to focus upon the transactions themselves, and then indicate which of the defendants are allegedly involved. The following discussion omits any reference to the outside director defendants, since I have concluded that the allegations against them are legally insufficient.[2] A number of transactions are alleged. They are set forth below. The allegations are treated as factual for the purposes of the motion. No such finding, of course, is to be inferred.

(1) *The 1975 Meat Inventory Scheme.*

Shortly before the end of Emersons' 1975 fiscal year, Radnay, Levi and United American entered into a scheme involving the false labeling and billing of meat shipped by United American and received by Emersons. Emersons' 1975 fiscal year ended in October, 1975. During that month, Emersons ordered and received from United American 100,000 pounds of sirloin steaks, at a cost value of approximately $200,000. Emersons and United American agreed that billing would be delayed, and no invoice sent for such shipment until the beginning of Emersons' 1976 fiscal year, in November. The steaks were falsely classified and mislabeled by Emersons' employees as "filet mignon" on its inventory records, and consequently were recorded at an inflated value of approximately $400,000. The results of the scheme were that Emersons' closing 1975 inventory was overstated by $200,000, and its closing 1975 accounts payable were understated by $200,000, resulting in an inflation of the company's 1975 pre-tax earnings by $400,000. In the first quarter of the 1976 fiscal year, invoices with false shipping dates were sent by United American to Emersons for the steaks, whereupon Emersons recognized accounts payable in fiscal 1976. Complaint, ¶¶ 23 and 24.

(2) *Improper Capitalization of Expense Items.*

In order to permit Emersons to report income at an amount previously projected for the end of its 1974 fiscal year, Emersons improperly capitalized about $153,000 in advertising expenses, without reasonable basis therefor. This transaction, which involved the purchase, sale, and lease-back of one of Emersons' restaurant units, had the effect of improperly increasing the reported fixed asset of that unit by $153,000, and Emersons' advertising expenses were correspondingly decreased by that amount, with the result that Emersons' pre-tax earnings for fiscal 1974 were erroneously inflated by $153,000. Complaint, ¶¶ 25 and 26.

Furthermore, Emersons improperly capitalized $180,600 in advertising costs not related to the opening of new restaurant units in fiscal 1975, thus causing a corresponding inflation of $180,600 in Emersons' reported fiscal 1975 pre-tax earnings. ¶ 27.

During its 1973, 1974 and 1975 fiscal years, Emersons perpetrated further improper capitalization of expenses relating to repairs, maintenance and inventory costs, with the result that the company's pre-tax earnings were improperly inflated by $34,-

---

2. See the Memorandum Opinion and Order of even date, filed concurrently herewith, 86 F.R.D. 66.

000 in fiscal 1973; $118,000 in fiscal 1974; and $109,000 in fiscal 1975. ¶ 28.

During its 1973, 1974 and 1975 fiscal years, Emersons improperly capitalized certain costs purportedly relating to construction of new units, with the result that the company's pre-tax earnings were improperly inflated by $94,000 in fiscal 1973; $173,000 in fiscal 1974; and $307,000 in fiscal 1975. ¶ 29.

During its 1975 fiscal year, Emersons improperly capitalized computer software and labor costs, thereby inflating its pre-tax earnings by $81,000 in fiscal 1975. ¶ 30.

During its 1975 fiscal year, Emersons improperly included certain purchasing and shipping costs in its inventory figures, with the result that its pre-tax earnings were improperly inflated by $88,000 in fiscal 1975. ¶ 31.

### (3) *Inventory Write-Ups.*

In order to report income at previously projected amounts, Emersons improperly and fraudulently increased its ending fiscal 1974 inventory by approximately $80,000, and its ending fiscal 1975 inventory by approximately $70,000, causing corresponding inflations of the company's reported pre-tax earnings for those particular years. The 1974 inventory was inflated by decreasing the amount of lower quality steaks reflected on its inventory reports by 44,280 pieces, and increasing by the same amount the recorded quantity of more expensive filet mignon. The 1975 inventory write-up was accomplished by inflating on paper the inventories of certain unaudited restaurant units. ¶¶ 32–34.

### (4) *Unrecorded Liabilities.*

During the 1974 and 1975 fiscal years, Emersons failed to report and record certain unspecified liabilities incurred during those periods, with the result that Emersons' accounts payable were understated. This resulted in over-statements of Emersons' pre-tax earnings for fiscal 1974 in the sum of $287,000 (unrecorded expenses $156,000; unrecorded assets $131,000), and for fiscal 1975 in the sum of $755,000 (unrecorded expenses $635,000; unrecorded assets $120,000). ¶ 35.

### (5) *Inventory Pricing.*

While the notes to Emersons' 1974 and 1975 financial statements stated that inventories were carried "at cost," the 1974 inventory priced non-meat items at prices above cost, and its 1975 inventory priced all items at prices above cost, with the result that Emersons' inventory as of October 27, 1974 was inflated by $73,000, and its inventory as of October 26, 1975 was inflated by $151,000. Such inflated inventories caused corresponding over-statements in Emersons' pre-tax earnings for those particular years. ¶¶ 36, 37.

### (6) *First Quarter 1976 Fiscal Year Misstatements.*

In order to report greater income for the first quarter of its 1976 fiscal year, with a particular view toward a planned public offering of the company's securities shortly after the end of that quarter, Emersons at the instance of Radnay and Levi "reversed out" approximately $180,000 of costs which had been incurred and previously expensed in the first quarter; and improperly capitalized approximately $50,000 of other expenses. In consequence, a substantial over-statement of Emersons' income for the first quarter of its 1976 fiscal year occurred. In addition, Emersons failed to disclose that in its first quarter, it followed an accounting method with respect to lease maintenance costs inconsistent with methods previously used. On or about March 12, 1976 Emersons filed with the SEC a quarterly report on Form 10–Q, and also disseminated to its shareholders, press media and others, a quarterly report to shareholders and a press release, in which Emersons erroneously reported a net income of $119,695 for the first quarter of its 1976 fiscal year. ¶¶ 38–42.

### (7) *Additional Non-Disclosures.*

In Emersons' financial statements for its fiscal years ending 1974 and 1975, and its interim statements in 1976, the company

failed to adequately disclose its leases of equipment and improvements as financing transactions involving the installment purchase of such property; failed to disclose the use of a different accounting method from that previously used, which resulted in greater earnings being reported; improperly included $100,000 contingent insurance claim under the heading of "sales"; and entered into loan arrangements with Radnay and Levi in respect of the purchase of shares of another public issuer, without disclosing the circumstances of the transactions in any document filed by the company with the SEC or disseminated to shareholders or the public. ¶¶ 43–46.

(8) *Improper Use of Emersons' Assets.*

Beginning at least as early as February, 1972, Radnay improperly caused Emersons to pay various personal expenses of Radnay's; and, beginning at least in 1973, Levi embarked upon a similar course of conduct. The diversion of corporate funds for these purposes was not disclosed in the applicable financial reports, proxy statements, and other documents issued and disseminated by Emersons. ¶¶ 50–57.[3]

(9) *Financial Statements and Proxy Statements.*

Finally, plaintiffs allege that for its fiscal years 1972, 1973, 1974, 1975 and the first quarter of 1976, Emersons filed with the SEC and disseminated to stockholders and the public financial statements, proxy statements, reports, documents and other items which contained material misrepresentations and omissions in respect of the company's true financial picture and business. Further, it is alleged that the statements and reports accompanying solicitations of proxies were equally deficient. The trans-

actions and occurrences either misrepresented or left undisclosed are those matters alleged in the preceding paragraphs of the complaint. As a result of all these acts, practices and omissions, plaintiffs and the class members are alleged to have purchased shares of Emersons at artificially inflated prices, "based upon erroneous and distorted financial information and reports . . . which failed to fairly and adequately present the financial and operating conditions of Emersons." ¶¶ 58–60.

These allegations of wrongdoing are followed by specific counts, addressed to each of the defendants. Leventhal, the accountants, are charged in counts I through IV, with violations of §§ 10(b), 13, and 14(a) of the 1934 Act, either as a principal or as an aider and abettor; and also with common law negligence and fraud. Similar charges are made against Emersons, Radnay, and Levi. The charges made against these defendants embrace the totality of transactions and occurrences set forth in the complaint. With respect to United American, it is charged with § 10(b) violations and common law fraud only in respect of the 1975 meat inventory scheme, alleged in ¶¶ 23 and 24 of the complaint.

B. *Requirements of Rule 23.*

To obtain a class certification under Rule 23, plaintiffs must establish two propositions. First, they must satisfy all four conditions of 23(a).[4] Then they must show that the action is appropriate under one of the three subdivisions of 23(b). The present plaintiffs invoke 23(b)(3). To proceed under that sub-division, they must show "that common questions of law predominate as to all members of the class and that a class action is superior to alternative ways of conducting the litigation." *Green v. Wolf Corp.*, 406 F.2d 291, 298 (2d Cir. 1968), *cert.*

---

3. This analysis of the complaint omits reference to ¶¶ 47–49. That is because the "liquor kickback" scheme referred to therein has been abandoned by plaintiffs as a possible basis of recovery. Plaintiffs' reply brief at pp. 5–7.

4. Rule 23(a) provides:
 "Prerequisites to a Class Action. One or more members of a class may sue or be sued as representative parties on behalf of all only

if (1) the class is so numerous that joinder of all members is impracticable, (2) there are questions of law or fact common to the class, (3) the claims or defenses of the representative parties are typical of the claims or defenses of the class, and (4) the representative parties will fairly and adequately protect the interests of the class."

*denied sub nom. Troster, Singer & Co. v. Green,* 395 U.S. 977, 89 S.Ct. 2131, 23 L.Ed.2d 766 (1969).[5]

■ The first two elements of 23(a) are clearly present. As to the first element, only defendant Levi suggests that plaintiffs have failed to show that "the class is so numerous that joinder of all members is impracticable." But the complaint alleges (¶ 4) that "many hundreds or thousands of persons purchased shares of Emersons' common stock during the class period." The affidavit of plaintiffs' counsel in support of the motion avers that Emersons is a publicly held corporation, and that at the end of the class period there were in excess of 1,300,000 shares outstanding, held by approximately 1,271 registered shareholders. Levi's argument that the first element has not been met is frivolous. *Green v. Wolf Corp., supra,* at 298.

The second 23(a) element, the presence of questions of law or fact common to the class, is met because plaintiffs charge that material misrepresentations and omissions appear in financial statements, proxies, and other documents addressed or available to all stockholders and investors· at the pertinent times. Thus "the existence and materiality of such misrepresentations [and omissions] obviously present important common issues." *Korn v. Franchard Corp.,* 456 F.2d 1206, 1210 (2d Cir. 1972) (material in brackets supplied).

The questions of substance raised by the motion papers are:

(1) Under 23(a)(3), are the representative parties' claims typical of the claims of the class?

(2) Under 23(a)(4), will those parties "fairly and adequately protect the interests of the class"?

(3) Under 23(b)(3), do the questions of law or fact common to members of the class *predominate* over any questions affecting only individual members?

.Following the order in which the parties have briefed these questions, I consider the last one first.

C. *The Predominance of Common Questions.*

When to allow a class action under 10b–5 presents a "serious and troublesome question." *Green v. Wolf Corp., supra,* at 295 (per Kaufman, Ct. J.). On the one hand, where securities involved in alleged misrepresentations and violations of 10b–5 are publicly held, "a class action may well be the appropriate means for expeditious litigation of the issues, because a large number of individuals may have been injured, although no one person may have been damaged to a degree which would have induced him to institute litigation solely on his own behalf." *Green* at 296. But several courts have recognized that where multiple misrepresentations or nondisclosures are alleged, over a substantial period of time and in respect of publicly held securities, individualized questions of reliance and materiality may predominate, rendering a class action inappropriate. *Gelman v. Westinghouse Electric Corp.,* 73 F.R.D. 60 (W.D.Pa. 1976); *Trattner v. American Fletcher Mortgage Investors,* 74 F.R.D. 352 (S.D.Ind. 1976).

The Supreme Court has not directly addressed the issue. In *Green, supra,* at 298, the Second Circuit declared its inclination to "view liberally claims which assert a right to a class action in 10b–5 cases at the early stages of the litigation"; primarily that is because of the flexibility available to

5. Rule 23(b)(3) provides in full that the action is maintainable as a class action if:

". . . the court finds that the questions of law or fact common to the members of the class predominate over any questions affecting only individual members, and that a class action is superior to other available methods for the fair and efficient adjudication of the controversy. The matters pertinent to the findings include: (A) the interest of members of the class in individually controlling the prosecution or defense of separate actions; (B) the extent and nature of any litigation concerning the controversy already commenced by or against members of the class; (C) the desirability or undesirability of concentrating the litigation of the claims in the particular forum; (D) the difficulties likely to be encountered in the management of a class action."

the trial court in its management of the action. *Green* reversed the district court's order denying class certification, where plaintiff sought to represent some 2,200 purchasers, over a 31-month period (June 2, 1961 through the end of 1963), of a corporation's common stock or subordinated debentures. Plaintiff alleged that three prospectuses, filed in February 1961, January 1962, and June 1962, contained untrue or misleading statements, in particular overstating the cash available for distribution to shareholders as listed in the balance sheets, which in turn inflated the purchase price of the stock. The district court, in the *Green* court's view, should be able to manage the litigation as a class action:

> "*Green* should be permitted to present the elaborate proof of misstatement, intent, effect on price, and so on, that any purchaser of Wolf's stock between June 1961 and 1963 would need in order to succeed. If the trial court finds at some convenient time that a distinction must be drawn between those who purchased at different times, it is free to make use of the flexibility available to it and so important to the proper application of Rule 23. For example, it may divide the class into subclasses (i. e. those purchasing after issuance of the first prospectus; those purchasing after issuance of the first prospectus and circulation of the second prospectus; and those purchasing after issuance of the first prospectus and circulation of the second and third prospectuses) Rule 23(c)(4), or make such other orders as are necessary, Rule 23(d)." *Id.* at 299.

*Green* holds, in essence, that the repetition of one misrepresentation of primary significance in a series of documents is not fatal to a contention that common questions predominate among a class of investors who purchased at different times.

Conversely, the allegation that "more than a hundred omissions and several misstatements" appeared in a single prospectus did not deter the Second Circuit, in *Korn v. Franchard Corporation*, 456 F.2d 1206 (2d Cir. 1972), from granting class certification in a 10b–5 suit, notwithstanding the possibility that individual investors may have relied on different misstatements, or been misled by different omissions. Again, the Court declined to say "at this juncture" that the common issues arising out of the prospectus would later prove to be subordinated to individual issues. 456 F.2d at 1212. The *Korn* court referred again to the several procedures available to the district courts "which can reduce the difficulties of showing individual reliance," and went on to observe, after reviewing other authority:

> "More specifically, in several of these decisions the courts, faced with our problem, have agreed in comparable class suit situations that the common questions predominate and the requirement of Rule 23(b)(3) is satisfied. Generally these decisions involved more complex sets of misrepresentations, raising more intricate problems of individual reliance, but nevertheless the courts ruled in favor of class suit status. To decide otherwise in this simpler case, with its single written prospectus and a major charge of nondisclosure, we would have to go directly counter to the strong and consistent trend, of which perhaps the leading pacesetter is this court's own decision in *Green v. Wolf Corp.*, supra." *Id.* at 1213.

To be sure, the single prospectus in *Korn* apparently contained one identifiable "major charge of nondisclosure"; and the Court also made reference to the Advisory Committee's cautionary statement:

> "'[A]lthough having some common core, a fraud case may be unsuited for treatment as a class action if there was material variation in the representations made or in the kinds or degrees of reliance by the persons to whom they were addressed.'" *Id.* at 1212 n. 14.

Notwithstanding that *caveat*, it is clear that the Second Circuit favors class certification in 10–b(5) cases, at least in the preliminary stages of litigation, where the trial court's supervisory powers are available to control the litigation as it unfolds. That favor has been communicated to other circuits. *Green v. Wolf, supra,* was cited

and followed by the Ninth Circuit in *Blackie v. Barrack*, 524 F.2d 891 (9th Cir. 1975), *cert. denied*, 429 U.S. 816, 97 S.Ct. 57, 50 L.Ed.2d 75, in which plaintiffs sought to represent a class of purchasers of a corporation's securities over a twenty-seven month period. Misrepresentations of the company's financial condition were alleged to have appeared in a series of annual and interim reports, press releases and SEC filings, beginning with a 1970 report and extending through the announcement of substantial losses in August of 1972. Defendants argued that, in these circumstances, common questions could not predominate. Their contention, summarized by the Court at 524 F.2d 903 n. 19, was that "the common question requirement is met only if all purchasers are injured by the same misrepresentation, or, in a 'course of conduct' case, by identical repeated misrepresentations and if defendant's liability can be established by proof both of the same set of facts and same legal principle." The Ninth Circuit rejected that view as "far too restrictive . . . of the common question requirement in the securities fraud context." *Ibid.* The *Blackie* Court, following *Wolf*, held that class certification is appropriate where plaintiffs allege fraud "over a period of time by similar misrepresentations"; it is the allegation of defendants' "course of conduct . . . in its broad outlines" that unifies the class, which is not defeated by "slight differences in the class members' positions." 524 F.2d at 902. As the *Blackie* Court observed, several district courts have held that "allegations simply that earnings and stock prices have been inflated over a period of time by a defendant's misrepresentations is sufficient to satisfy the common question requirement." *Id.* at 903 n. 19. Nor, in the view of the *Blackie* Court, need all the misrepresentations be related to each other:

> "Moreover, even when misrepresentations are unrelated, class members may share a common question of law or fact. Of course, if an early misrepresentation is undissipated, a later purchaser will present a common question even if another misrepresentation has intervened. But

even if the effect of the earlier misrepresentation is dissipated, proof of the earlier misrepresentation may be relevant to the latter purchaser's case. Proof of the earlier fraud and its effects might be relevant circumstantially to establish duty standards, culpability, or damages regarding the later fraud; it would establish background information about the defendant common to both suits. Thus, even when unrelated misrepresentations are alleged as part of a common scheme, class members may share common factual questions, and trial in the same forum avoids duplicative proof." *Ibid.*

The *Blackie* case, in its perception of predominating common questions even among unrelated misrepresentations in a series of separate documents, perhaps carries the concept further than did the Second Circuit in *Green* and *Korn, supra.* However, the rationale of *Blackie* appears consistent with the spirit of Second Circuit authority, and I find it persuasive in the case at bar.

The district courts have reached differing conclusions in 10(b) and 10b–5 cases, according to the circumstances. In *Trattner v. American Fletcher Mortgage Investors, supra*, the named plaintiffs, purchasers of shares in a real estate investment trust, sought to represent all purchasers between December 1, 1973 and February 25, 1976. In the absence of "a single event which can be isolated as the basis for potential 10b–5 liability," plaintiffs relied upon a "common and continuing course of conduct" theory. The district court rejected that theory in *Trattner* because, during the 27-month class period, "substantial changes took place in the American economy in that the prime rate rose considerably and the index of construction costs significantly increased." The impact of those economic conditions upon real estate investment trusts persuaded the court that common factual questions would not predominate among the class members. The court also stressed the difference in sophistication levels among the three named plaintiffs. 74 F.R.D. at 356–7.

*Gelman v. Westinghouse Electric Corp., supra,* also declined to apply the "common cause of conduct" theory, in a case where the named plaintiffs sought to represent all sellers of Westinghouse stock between May 2 and December 30, 1974. Plaintiffs' theory was Westinghouse, through a series of non-disclosures and misrepresentations, concealed its intention to divest itself of its money-losing major appliance division, thereby artificially depressing the market price of its own common stock during the eight-month period of negotiations eventually culminating in sale. The district court held that common questions did not predominate because plaintiffs alleged "no fewer than 18 separate, purportedly significant events directly related to the company's major appliance business," whose relative significance and hypothetical impact of disclosure upon the market "would appear to have changed nearly from day to day." 73 F.R.D. at 67. The court continued:

> "In these circumstances, where plaintiffs' own specific allegations outline a long series of variously significant developments relating to the defendant company's major appliance business, it is difficult to identify a single set of facts predominantly common to the entire eight-month period upon which the issue of liability to each member of the proposed seller class can be litigated." *Ibid.*

In addition, the court found a fatal lack of commonality as to the materiality of the undisclosed facts:

> "Clearly, the question of materiality as it pertains to the claim of a shareholder who sold stock in May or June is vastly different from the question as it pertains to claims stemming from sales in November or December." *Id.* at 68.

By way of contrast, this Court held that a "common course of conduct" sufficient to justify class certification was alleged in *Fischer v. Kletz,* 41 F.R.D. 377 (S.D.N.Y. 1966), where purchasers of securities of Yale Express System, Inc. alleged that various financial statements issued by the company overstated its earnings and revenues, so that plaintiffs purchased the securities at an inflated value. The named plaintiffs sought to represent all purchasers of securities between August 20, 1963 and May 6, 1965. During this period, "at least seven statements reflecting the financial condition of Yale were issued." 41 F.R.D. at 380. In these circumstances, defendants argued that liability must be considered on the basis of each individual misrepresentation, so that a class should not be certified. This Court, certifying the class, said in an opinion by Judge Tyler:

> "The basis for plaintiffs' argument is that the financial statements are so interrelated, interdependent and cumulative that the price at which the 1965 investor bought a Yale security was affected by the alleged misrepresentations in the 1963 prospectus. Since the 1963 and 1965 investors, in spite of their disparate temporal positions, were "harmed" by the same alleged wrongful acts of defendants, the questions of law and fact incident to such harm, say plaintiffs, are common to all purchasers.

> "I accept this rationale. To be sure, we are not dealing here with a single alleged fraudulent misrepresentation or the issuance of a single document containing several alleged misrepresentations. Like standing dominoes, however, one misrepresentation in a financial statement can cause subsequent statements to fall into inaccuracy and distortion when considered by themselves or compared with previous statements. Such a possible close causal relationship between the various alleged misrepresentations in the Yale financial statements leads to the conclusion that members of the class are interested in 'common questions of law and fact'." *Id.* at 381.

The Court concluded that a common cause of conduct, rendering 23(b)(3) certification appropriate, was set out in the complaint:

> "The issuance by Yale of seven financial statements allegedly containing a series of false and misleading statements based on cumulative and interrelated data would seem to constitute the requisite 'common course of conduct' contemplated by the court in *Harris.*" *Ibid.* (citing

*Harris v. Palm Springs Alpine Estates, Inc.*, 329 F.2d 909 (9th Cir. 1964).

*Fischer* was followed in *Aboudi v. Daroff*, 65 F.R.D. 388 (S.D.N.Y.1974), a comparable suit in which false representations were alleged to have infected a company's quarterly reports from October, 1969 through October, 1971; annual reports for 1970 and 1971; nine separate press releases appearing between December, 1969 and March, 1972; and statements of an executive reported in February, 1971. 65 F.R.D. at 389 n. 3. Plaintiffs sought to certify a class of purchasers of common stock during the period from December 10, 1969 through March 14, 1972. Judge Pierce certified the class, stating that the "commonality" requirement of Rule 23(a)(2) was satisfied by the pleadings:

". . . the fact that plaintiff has not chosen to rely on a single misrepresentation or on a single document containing several misrepresentations cannot serve to defeat his class action claim. See *Fischer v. Kletz*, 41 F.R.D. 377 (S.D.N.Y. 1966). Where, as here, it is alleged that a series of reports and statements containing interrelated and cumulative misleading data were issued to the investing public, a course of conduct is presented which raises questions common to all those who purchased during the period when the data was being disseminated. See *Green v. Wolf Corp.*, 406 F.2d 291 (2d Cir. 1968), cert. denied, 395 U.S. 977, 89 S.Ct. 2131, 23 L.Ed.2d 766 (1969); *Harris v. Palm Springs Alpine Estates, Inc.*, 329 F.2d 909 (9th Cir. 1964); *Fischer v. Kletz*, supra; *Kronenberg v. Hotel Governor Clinton, Inc.*, 41 F.R.D. 42 (S.D.N.Y.1966). These questions include the issues of whether during the period at issue Botany's reported earnings were overstated and its financial condition misrepresented and whether the market price of Botany's common stock was inflated as a result of the actions charged." *Id.* at 390–391.

The *predominance* of common questions Judge Pierce left to a later day, in view of his inability to "say at this time that . . . individual questions will outweigh the significant common questions which have been raised concerning the existence and materiality of the alleged misrepresentations." *Id.* at 393, citing *Korn, supra*. This Court in *Aboudi* recognized its power under Rule 23(c)(1) to alter or amend the class certification if later developments so required.

An instructive analysis appears in *Mascolo v. Merrill Lynch, Pierce, Fenner & Smith, Inc.*, 71 F.R.D. 491 (S.D.N.Y.1976). Customers of a brokerage firm alleged 10(b) and 10b–5 violations relating to purchases of stock recommended by the firm. Judge Brieant, after a thorough review of the authorities, held that class treatment was inappropriate in respect of purchases fraudulently induced by oral representations of stockbrokers, *id.* at 500; but that class action treatment would be granted as to the alleged failure to disclose that the firm and its account executives derived greater pecuniary benefits from the sale of over-the-counter stock in which the firm made a market, such as the stock in question, than were available for other transactions. The Court held:

"This claim is susceptible of class litigation. Issues common to the class are whether Merrill Lynch received higher compensation on transactions in O–T–C securities for which it made a market, whether account executives received higher compensation on such transactions, whether either of these compensation plans, considered separately or together, was a scheme or artifice to defraud, or whether failing to inform customers of these policies was the omission of a material fact." *Id.* at 509.

Although the case presented "individual issues of whether disclosure was made to a particular customer and that customer's measure of damages," *ibid.*, Judge Brieant cited *Green, supra*, and *Korn, supra*, and observed:

"The individual issues here are similar to the individual issues of reliance and damages that ordinarily remain in a class adjudication of fraud claims premised on misrepresentations." *Id.* at 510.

The current trend of authority, at least in this Court, is stated by Judge Stewart in *Weiss v. Drew National Corp.*, 71 F.R.D. 429, 430 (S.D.N.Y.1976):

"We do not agree with defendants that the duration of the alleged conspiracy or the numerosity of the written statements involved defeat the propriety of class certification. Rather, as a growing number of courts have recognized, where plaintiff claims a continuing course of conduct and points to specific and identified documents which are alleged to contain interrelated and cumulative misrepresentations, class certification is proper." (citing, *inter alia, Blackie, supra; Green, supra; Aboudi, supra;* and *Fischer, supra*).

Two recent cases reflect the differing considerations. In *Kane Associates v. Clifford*, 80 F.R.D. 402 (E.D.N.Y.1978), class certification was granted under 23(b)(3) where plaintiffs alleged that the defendants failed to disclose, throughout a series of annual reports, public releases, and other financial statements, sustained and anticipated losses arising out of a series of high-risk loans. Citing a number of the cases discussed *supra*, the Court said:

"This case presents, in other words, claims with respect to an alleged continuing course of conduct pursuant to which a series of documents containing interrelated and cumulative misrepresentations were employed—the kind of claim which numerous cases have recognized as presenting common issues with regard to materiality and scienter on facts similar to those at issue." 80 F.R.D. at 405.

The individual issues did not bar class certification:

"Where plaintiffs are able to prove, as they undertake to prove in this case, that all stock purchased by the class was subjected to a single inflationary scheme which in fact had an inflationary impact through the proposed class period, then the only individual issues remaining are as to the extent of the inflation at the date of the class member's purchase, an individual issue with regard to damages which should not, in and of itself, defeat the class action as a class action." *Id.* at 407.

Compare *DeSimone v. Industrial Bio-Test Laboratories, Inc.*, 80 F.R.D. 112 (S.D.N.Y. 1978), where the plaintiff alleged only that defendants had made "an unspecified number of false and misleading statements in the period commencing in October 1975 and ending in August 1976." *Id.* at 113. Denying class certification on the basis of such a pleading, Judge MacMahon said that "this is not a case involving a number of purchases made in reliance on a limited number of allegedly false and misleading statements." *Ibid.*

■ Other cases could be cited, but to a substantial degree each turns upon its own circumstances. In the case at bar, I am satisfied that, at least at this relatively early stage in the litigation, class certification is appropriate.

While a number of different artifices and devices are alleged, they are all in furtherance of "a single inflationary scheme," *Kane, supra*: the artificial overvaluing of Emersons' stock. Furthermore, the primary impact of the scheme covers a relatively brief period of time. Of the several artifices alleged in the complaint, the following relate solely to 1974 and/or 1975: the meat inventory scheme; the inventory write-ups; unrecorded liabilities; inventory pricing; and certain additional non-disclosures. The major emphasis of the alleged improper capitalization of expenses is upon 1974 and 1975, although there is also a reference to the effect of improper capitalization upon earnings in the 1973 fiscal year. As for the other categories of wrongdoing, the "first quarter 1976 fiscal year misstatements" refers, as its caption indicates, to the first quarter of 1976; the allegations concerning the improper use of assets begin in 1972 in respect of Radnay, and in 1973 in respect of Levi; and the general allegations of non-disclosure in financial statements and proxy statements cover fiscal years 1972 through 1975 and the first quarter of 1976. It is fair to say that plaintiffs are concentrating particularly upon fiscal years 1974 and 1975, although the putative class

includes purchasers between January 29, 1973 and April 7, 1976.

While the boundaries of the case embrace a number of non-disclosures, and affect a series of financial statements, it is clear from the cited cases that these factors are insufficient to deny class certification. It is also significant that, while there are a variety of alleged wrongdoings, the case is in essence one of non-disclosure. Individual showings of reliance are therefore not necessary to recovery. *Affiliated Ute Citizens v. United States*, 406 U.S. 128, 153–154, 92 S.Ct. 1456, 1472, 31 L.Ed.2d 741 (1972); *Gelman v. Westinghouse Electric Corp., supra*, at 67 n. 7; *Mascolo, supra*, at 503–504. This is a factor which reduces the likelihood that individual questions may ultimately predominate over common questions.

In sum, plaintiffs have sufficiently alleged a common course of conduct, whereby the defendants employed artifices and devices to inflate Emersons' earnings and, in consequence, the value of its shares, while at the same time conspiring to withhold disclosure of these material facts. A class will be certified pursuant to Rule 23(b)(3). I am mindful, as were the courts in the cases cited, of my power to alter or amend this order under Rule 23(c)(1), should subsequent circumstances require. However, it is clear that to deny class certification at this time would fly in the face of controlling Second Circuit authority, as further interpreted and developed by numerous decisions of this Court.

D. *Typicality of the Named Plaintiffs' Claims.*

David Walker having departed as a named plaintiff (see n. 1, *ante*), Roger Greene and Theodore Abbey remain. Defendants attack their suitability as class representatives on the ground that their claims are not "typical of the claims . . . of the class," as required by Rule 23(a)(3). Two reasons are urged: (1) both purchased Emersons' stock at a time when they knew "that there were problems of illegal under-the-counter payments by liquor suppliers to restaurants, and that these problems affect-ed Emersons" (Leventhal brief at p. 34); and (2) both determined to purchase the stock on the basis of documents and information not in general circulation.

The first argument focuses upon ¶¶ 47–49 of the second amended complaint, which alleges that in August or September, 1971, Emersons, Radnay and Levi arranged to have Emersons purchase beer and liquor from certain manufacturers in exchange for kickbacks and unlawful price reductions. Greene and Abbey gave deposition testimony tending to show that, at the time they purchased Emersons' stock, they knew of and discounted the significance of such a practice. That circumstance, Leventhal argues, brings about "a sharp variance on a fundamental issue in the lawsuit" (brief at p. 34), rendering the named plaintiffs' interests antagonistic to class members who might be inclined to take a more serious view of these particular transactions.

 Plaintiffs respond that the argument is mooted by their abandonment of the alleged liquor kickbacks as a basis of recovery (see n. 3, *ante*). That is a sufficient response only if the abandonment is plausible, given the underlying theory of the action: that is to say, the named plaintiffs would not be proper class representatives if they were prepared, for the purpose of remaining in office, to abandon a claim which other class members might wish to press. In the case at bar, however, the underlying theory is an artificial inflation of Emersons' assets. Improper kickbacks, received and concealed, have the effect of making the assets appear less than they are, not more. Accordingly no tactical motive may be inferred from the withdrawal of this claim; and its disappearance moots the concerns professed by defendants.

Defendants' second argument seeks to characterize Greene and Abbey as "tippees," the recipients of varieties of inside information which make their situations atypical from those purchasers who simply relied on the integrity of the market.

■ Where it is clear that putative class representatives purchased securities in reliance upon personal sources of information or advice not available to the general investing public, they may be disqualified from representing a class drawn from that public. This is the rationale underlying *Greenspan v. Brassler*, 78 F.R.D. 130 (S.D. N.Y.1978). Judge MacMahon denied class certification where the named plaintiffs' third purchase of the stock in question was made after the company "had disclosed much of the information plaintiffs now allege should have been revealed in the financial reports" and while the market price of the stock "was near its nadir"; the court was also satisfied that "all of plaintiffs' purchases were made in reliance on their brother Noah's recommendation, rather than on their analysis of the market performance of the stock." Clearly in those circumstances, plaintiffs' position differed so fundamentally from that of a purchaser who relied solely upon market performance, as revealed in public documents, that they could not act as effective representatives of such a class. However, reliance upon nonpublic sources does not necessarily bar an investor from acting as a class representative. In *Fogel v. Wolfgang*, 47 F.R.D. 213 (S.D.N.Y.1969), this Court permitted the named plaintiffs to act as class representatives, notwithstanding their admission during depositions that "in purchasing Rand stock they relied primarily on the recommendation of . . . a business associate, who claimed to know several of the officers of Rand." *Id.* at 216. Again, the cases turn upon their circumstances. In the case at bar, I am satisfied that the alleged "inside" sources of information do not rise to the level of disqualification. The particular market reports upon which defendants rely (in the case of Greene, a report prepared and distributed by New York Securities Company; and in the case of Abbey, a research report by Coenen & Co.) were apparently derived themselves from financial information disseminated by Emersons to the general public; these compilations, and the favorable recommendations based upon them, are no more "inside" or confidential than the public information upon which they were based. Furthermore, over six months elapsed before Greene purchased Emersons' stock after reading the report in question; and Abbey did not make his first purchase until eight months after reading the report. The chronology suggests that the reports were of no particular significance to either purchase. Defendants stress a telephone call Abbey placed to Emersons when the stock began to decline. Abbey found himself talking to defendant Levi, but the deposition transcript makes it clear that Abbey telephoned out of general concern, and received nothing but general reassurances in response. "Very frankly," Abbey testified, "I didn't expect any specific information." Tr. 163. Nor did he receive any; certainly none of the quality that would characterize him as a "tippee," and thus disqualify him as a class representative. The question, as the court in *Kane Associates, supra*, pointed out at 409, "is not whether his situation is in all respects identical with that of all other class members, but whether he may be expected to prosecute the class claims vigorously and whether any claim he has is antagonistic to the claims of the class." *Kane* holds that a particular named plaintiff could represent the class, notwithstanding the fact that "his active interest in the financial performance of [the company], including his membership in a group of minority stockholders and personal calls and correspondence to . . . management, gave him somewhat more information . . . than was possessed by other members of the class." *Ibid.* A fortiori, this rationale is applicable to Greene and Abbey. I further conclude that Abbey's "sophistication" in the restaurant business, also relied upon by defendants, does not serve to disqualify him.

On the present record, I hold that the named plaintiffs' claims demonstrate sufficient typicality to satisfy the requirements of Rule 23(a)(3).

E. *The Adequacy of Plaintiffs' Representation.*

Defendants challenge, on a number of grounds,[6] the ability of the named plaintiffs to "fairly and adequately protect the interests of the class," as required by Rule 23(a)(4).

Defendants Radnay and Levi focus upon the times at which Greene and Abbey bought their stock in Emersons. Abbey made nine separate purchases, during the following months and in the indicated amounts of shares: August 1973 (200); September 1973 (300); July 1974 (400); February 1975 (100); January 1975 (500); February 1975 (200); March 1975 (200); October 1975 (1,000); and November 1975 (700). Greene purchased 500 shares in March 1976. It also appears that Abbey has sold all but 50 of the shares which he purchased, while Greene still retains all of his shares.

■ These factors are said to bring about conditions of conflict between Greene and Abbey themselves, as well as between Greene, Abbey and other class members. Radnay contends: "Obviously, there is a conflict between the members of the class who sold and those who still retain the stock," (brief, p. 23). But counsel's briefing of the point leaves much to be desired. *Herbst v. Able*, 45 F.R.D. 451 (S.D.N.Y. 1968), is cited for the quoted proposition. In that opinion, Judge Motley raised, but specifically did not answer, the preliminary question of whether claimants who still owned stock could "fairly and adequately" protect interests of those who had sold the stock at a loss. Having posed the question, the court went on to say: "Because of these unanswered questions, this court cannot now conclude that this action is maintainable as a class action." *Id.* at 455. A further hearing was scheduled, whose results appear in *Herbst v. Able*, 47 F.R.D. 11 (S.D.N.Y.1969), in which the court expressed its conviction "that a plaintiff who has acquired and *retained* securities of

Douglas can 'fairly and adequately' represent those who purchased securities and thereafter sold them—and vice versa." *Id.* at 15. In *Herbst v. International Telephone & Telegraph Corp.*, 495 F.2d 1308, 1314 (2d Cir. 1974), the Second Circuit cited that later ruling for the following proposition:

"Furthermore, we do not perceive any conflict of interest between those who have retained their ITT shares and those who have since sold them. The personal interest of those who still hold ITT stock in gaining more from the exchange than they did far outweighs their concern that any award could damage ITT."

■ Next, it is argued that purchasers at an early phase of the class period are in unacceptable conflict with purchasers toward the end of the class period, since each would have an interest in maximizing the significance of events preceding their own purchases, while minimizing the importance of events occurring at other times. There is authority for this concern. *Robinson v. Penn Central Co.*, 58 F.R.D. 436, 443 (S.D.N.Y.1973); *Feldman v. Lifton*, 64 F.R.D. 539, 546 (S.D.N.Y.1974); *DeSimone v. Industrial Bio-Test Laboratories, Inc., supra.* And, since the purported class would include not only those who purchased and retained Emersons' stock, but also those who purchased and sold it during the class period, an additional source of potential conflict arises, as summarized in *Blackie v. Barrack, supra* :

". . . a purchaser early in the class period who later sells will desire to maximize the deflation due to an intervening corrective disclosure in order to maximize his out of pocket damages, but in so doing will conflict with his purchaser, who is interested in maximizing the inflation in the price he pays." 524 F.2d at 908.

While differing interests among class members may ultimately surface, the greater weight of recent authority militates against denying class certification on that ground, at least at this stage of the proceedings. Thus the *Blackie* Court, affirm-

---

**6.** One of these, asserted by Leventhal, constitutes a reprise of the "liquor kickbacks" theme. The abandonment of that theory of recovery,

which mooted a comparable objection addressed to typicality, has the same effect here. See p. 59, *ante.*

ing the certification of a class, said of this particular objection:

"Here, the conflict, if any, is peripheral, and substantially outweighed by the class members' common interests. Even assuming *arguendo* that the out of pocket standard applies, the class is proper. Every class member shares an overriding common interest in establishing the existence and materiality of misrepresentations. The major portion of the inflation alleged is attributed to causes which allegedly persisted throughout the class period. It will be in the interest of each class member to maximize the inflation from those causes at every point in the class period, both to demonstrate the *sine qua non* —liability—and to maximize his own potential damages—the more the stock is inflated, the more every class member stands to recover." *Id.* at 909–910.

The *Blackie* Court made reference to "the mechanism of subsequent creation of subclasses, Rule 23(c)(4), to deal with latent conflicts which may surface as the suit progresses." *Id.* at 909. That is precisely the consideration which influenced the Second Circuit, in *Green v. Wolf Corp., supra,* to permit a purchaser late in the class period to represent the entire class. See also *Kane Associates, supra,* at 409.

In the case at bar, the purchases of Abbey and Greene, when considered together, span the entire purported class period. That is in itself an indication of adequacy of class representation. Any conflicts between the plaintiffs themselves, or between the plaintiffs and other members of the class, may be dealt with as they arise, within the context of Rule 23(c)(4).

Finally, defendants attack the named plaintiffs' financial and other personal capacities. "Whatever the general state of plaintiffs' finances, the factors most salient for the court are plaintiffs' ability to finance the notice to absentees mandated by Fed.R.Civ.P. 23(c)(2), and to retain effective and vigorous counsel to press the action." *Shelter Realty Corp. v. Allied Maintenance Corp.,* 75 F.R.D. 34, 39–40 (S.D.N.Y.1977).

As to the latter concern, plaintiffs' counsel are effective, vigorous, and experienced in the field; it is apparent from counsel's prosecution of the case that they have worked out with plaintiffs an arrangement as to compensation. The Court is not overly concerned with the details of that arrangement; indeed, in *Sanderson v. Winner,* 507 F.2d 477 (10th Cir. 1974), *cert. denied,* 421 U.S. 914, 95 S.Ct. 1573, 43 L.Ed.2d 780 (1975), upon which Leventhal places a misguided reliance, the Tenth Circuit said it was none of the class action defendants' business. Quashing notices to take depositions, the *Sanderson* court said:

"Nor do we see that the defendants have any legitimate concern as to whether plaintiffs will be able to pay their lawyers and will be able to pay a judgment for costs in the event that such a judgment is entered. In this respect we see no difference between the case at bar and any other lawsuit." *Id.* at 480.

The Court is more directly concerned with plaintiffs' ability to finance the notice required by the Rule as interpreted in *Eisen v. Carlisle & Jacquelin,* 417 U.S. 156, 178, 94 S.Ct. 2140, 2152, 40 L.Ed.2d 732 (1974). There is lower authority for denying class certification where it is clear that the cost of the requisite notice exceeds the named plaintiffs' capacity to pay. *Ralston v. Volkswagenwerk, A. G.,* 61 F.R.D. 427 (W.D.Mo.1973), also cited by Leventhal, is such a case. But the particular circumstances of *Ralston* appear from its analysis in *Sanderson, supra,* at 480:

"We are aware that some lower court decisions have considered the plaintiff's ability to pay as relevant and proper in the present context. See *P. D. Q. Inc. of Miami v. Nissan Motor Corp. in U. S. A.,* 61 F.R.D. 372 (S.D.Fla.1973); *Ralston v. Volkswagenwerk, A. G.,* 61 F.R.D. 427 (W.D.Mo.1973). However, in both of these cases in which antitrust violations were alleged, the plaintiffs sought to represent a class of all new car purchasers in the United States. Thus, there was legitimate concern about the ability of the plaintiffs to successfully lead a class of

this magnitude. Also, the court in *Ralston* was concerned about its ability to manage the class. The mentioned considerations are not present here."

The present rule in this Court, articulated within the discovery context, appears in *Kamens v. Horizon Corp.*, 81 F.R.D. 444 (S.D.N.Y.1979):

"Questions concerning the details of purported class representative's finances are irrelevant when counsel for the plaintiff has agreed to advance the costs of the litigation and there are no factors present which cast doubt on plaintiff's ability to reimburse counsel (e. g., pending bankruptcy or evidence of financial distress). Defendants sought discovery of plaintiff's financial resources as well as her understanding of the exact amount of the likely costs of the class suit. At her deposition, plaintiff testified that her attorneys were authorized to advance all costs with respect to notification of the class. She also testified that she accepted any liability for expenses advanced by counsel. Further, she specifically stated that whatever these costs might be, she was prepared to see the litigation through. In the absence of any contention that the funds necessary to effectively prosecute this action would not be advanced by counsel, the court found no valid basis for questioning plaintiff about her financial resources." (summary of opinion).

In the case at bar, Abbey was in bankruptcy and unemployed when defendants deposed him; that was a legitimate ground for concern. Plaintiffs' reply brief (p. 39) states that "[S]ince then, Abbey has completed the dissolution of [his] restaurant and has obtained full time employment." There is no suggestion that Greene has ever been in financial difficulty. The record contains assertions by both Abbey and Greene that they understand their obligations and are prepared to meet them. Counsel are prepared to advance the costs, a practice sanctioned by authority. *Kamens, supra; Wolgin v. Magic Marker Corp.*, 82 F.R.D. 168, 175 (E.D.Pa.1979). The notice requirements would not appear to be as onerous or expensive as in *Ralston*. In these circumstances, there are insufficient grounds for economic concern to deny class certification. I will exercise a supervisory power, and monitor the mechanics and cost of the notice. *Shelter Realty Corp., supra*, at 40. In view of Abbey's prior bankruptcy, defendants may depose him further, if they wish, in order to test the unverified account of his restored financial condition that appears in plaintiffs' brief.

I reject defendants' contention that Abbey has relied unduly upon counsel in the case, and suffers from a fatal lack of personal involvement. *Cohen v. Uniroyal, Inc.*, 77 F.R.D. 685, 692 (E.D.Pa.1977).

A class will be certified in the form prayed for in the second amended complaint, as modified by plaintiffs' brief on this motion. The certification is conditional, and subject to alteration or amendment pursuant to Rule 23(c)(1).

## II.

## UNITED AMERICAN'S MOTION TO DISMISS

United American moves to dismiss the complaint for lack of personal jurisdiction and improper venue.

This defendant is named in connection with only one of the devices alleged in the complaint: the 1975 meat inventory scheme (p. 50, *ante*; complaint, ¶¶ 23, 24). To recapitulate, Emersons, Radnay, Levi and United American are charged with having entered into a scheme to falsely label and bill meat sold by United American to Emersons in 1975. The complaint alleges that in October, 1975, Emersons ordered and received from United American 100,000 lbs. of steak at a cost value of about $200,000. "Emersons and United American agreed that said steaks would be shipped and delivered to Emersons prior to the end of Emersons' 1975 fiscal year in October, but billing would be delayed and no invoice would be sent by United American for such shipment until the beginning of Emersons' 1976 fiscal year in November." Complaint, ¶ 24. This is the false billing aspect of the scheme.

The complaint further alleges that the steaks were falsely classified and mislabeled "by Emersons' employees" as filet mignon on its inventory records, whereas in fact they were mere sirloins. The combination of the false billing and false labeling is said to have inflated the value of Emersons' inventory. The complaint does not directly allege complicity by United American in the false labeling; however, in respect of the false billing, ¶ 24 alleges: "After the end of the 1975 fiscal year, and in the first quarter of the 1976 fiscal year, again pursuant to the plan, scheme and conspiracy, invoices with false shipping dates were sent by United American to Emersons for such steaks."

The affidavits in support of United American's jurisdictional motion tend to show that United American is an Illinois corporation, having its principal place of business at Chicago. United American describes itself as engaged in the purchase and resale of goods and meat products. It has never been licensed to do business in New York; and the affidavit of its treasurer-secretary, Gerald Kolb, contains averments purporting to establish that United American does not do business in New York of sufficient nature to sustain personal jurisdiction under the standards declared in *International Shoe Co. v. Washington*, 326 U.S. 310, 316, 66 S.Ct. 154, 158, 90 L.Ed. 95 (1945) and its progeny. The affidavits further indicate that the shipments of meat in question were accepted by an Emersons' driver at United American's plant in Chicago, for transportation by truck to Emersons' facility at Alexandria, Virginia. In these circumstances, United American argues that there is no basis for "long-arm" jurisdiction under N.Y. CPLR section 302(a).

The complaint, alleging section 10(b) and Rule 10b–5 violations, is governed in respect of jurisdiction and venue by Section 27 of the 1934 Act, 15 U.S.C. § 78aa, which reads in pertinent part as follows:

"The district courts of the United States, and the United States courts of any Territory or other place subject to the jurisdiction of the United States shall have exclusive jurisdiction of violations of this chapter or the rules and regulations thereunder, and of all suits in equity and actions at law brought to enforce any liability or duty created by this chapter or the rules and regulations thereunder. Any criminal proceeding may be brought in the district wherein any act or transaction constituting the violation occurred. Any suit or action to enforce any liability or duty created by this chapter or rules and regulations thereunder, or to enjoin any violation of such chapter or rules and regulations, may be brought in any such district or in the district wherein the defendant is found or is an inhabitant or transacts business, and process in such cases may be served in any other district of which the defendant is an inhabitant or wherever the defendant may be found."

True to its caption, "Jurisdiction of offenses and suits," Section 27 addresses both criminal prosecutions and civil suits. A criminal proceeding may be brought in a district "wherein any act or transaction constituting the violation occurred." A civil suit, such as the case at bar, may be brought "in any such district or in the district wherein the defendant is found or is an inhabitant or transacts business . ." Process in civil suits may be served "in any other district of which the defendant is an inhabitant or wherever the defendant may be found."

The Second Circuit has characterized this section of the 1934 Act as speaking "with atypical clarity in authorizing nationwide service of process." *Mariash v. Morrill*, 496 F.2d 1138, 1140 (2d Cir. 1974). Its interpretations by the courts are by now well settled. In a criminal case, a defendant may be proceeded against in any district "wherein any act or transaction constituting the violation occurred." As for a civil action, a defendant may be sued in any district that would be appropriate, under the foregoing test, if the action were criminal in nature—hence the reference to "any such district" in the third sentence of Section 27—or, as an

alternative, in a district where the defendant "is found or is an inhabitant or transacts business." To the extent that a civil plaintiff is proceeding under the first of these alternatives, the "test for a civil action is that applicable to a criminal proceeding under the Act," *Hooper v. Mountain States Securities Corp.*, 282 F.2d 195, 204 (5th Cir. 1960), *cert. denied*, 365 U.S. 814, 81 S.Ct. 695, 5 L.Ed.2d 693 (1961).

That is the jurisdictional theory upon which the present plaintiffs proceed. While there are faint suggestions, by plaintiffs and defendant Leventhal (which joins in opposition to United American's motion) that United American might be transacting business in New York, or be otherwise subject to the long-arm statute, the primary contention is that jurisdiction and venue in this Court are proper because this is a district "wherein any act or transaction constituting the violation occurred."

That contention, if well-founded, is sufficient to sustain jurisdiction and venue over United American, entirely without regard to the New York jurisdictional statutes. "Since we hold that Congress meant § 27 to extend personal jurisdiction to the full reach permitted by the due process clause, it is unnecessary to discuss the applicability of the New York statutes, which could reach no further." *Leasco Data Processing Equipment Corp. v. Maxwell*, 468 F.2d 1326, 1339 (2d Cir. 1972).

■ United American contends that jurisdictional and venue defects appear from the face of the complaint. The complaint, of course, must be read liberally. *Mariash, supra*, at 1144, and cases cited. The complaint makes a sufficient showing of jurisdiction and venue if it alleges that "any act or transaction constituting the violation" occurred in this district; and that United American participated in some manner in the scheme. United American resides within the territorial boundaries of the United States. So long as United American received notice of the action through personal service in Illinois—and it is not suggested otherwise on this motion— the nationwide service of process contem-plated by Section 27 is sufficient to bring United American before this Court. *Mariash, supra*, at 1142–1143. Additional considerations would arise if United American was a foreign corporation; then we would have to consider the propriety of true extraterritorial service of process under the 1934 Act. That was the situation presented by *Leasco, supra* ; however, in the case of an American defendant, "minimal contacts" principles are not relevant. *Mariash, supra*, at 1143 n. 9.

■ Upon a liberal construction of the amended complaint, it is clear that this district qualifies as one "wherein any act or transaction constituting the violation occurred." The defendants are charged with failing to disclose a number of schemes, including the meat inventory scheme, in statements and documents, including proxy statements mailed to plaintiffs and other class members. While the complaint is not specific, it does not appear to be disputed that the named plaintiffs resided in New York. The mailing of a proxy to a plaintiff, at his home in this district, was held sufficient to establish venue under Section 27 in *Zorn v. Anderson*, 263 F.Supp. 745, 748 (S.D.N.Y.1966), in which the court stated:

> "Venue under the Exchange Act is proper if one act in furtherance of the unlawful scheme is done in the forum district. This does not require that each defendant perform such an act; sufficient is an act of which all the defendants were the intended beneficiaries and a part of the fraudulent scheme."

It is of no significance that "the venue conferring act is not itself alleged to be illegal, but is on its face a neutral act or transaction"; the pertinent test requires the Court to "examine the relationship between the venue conferring act and the offenses alleged in the complaint." *Abramson v. Ina Capital Management Corp.*, 459 F.Supp. 917 (E.D.N.Y.1978).

In the case at bar, United American is alleged to have knowingly participated in a fraudulent billing scheme, which had a substantial inflationary impact upon Emersons' reported assets at the end of fiscal 1975.

Those allegations, together with the further acts occurring in New York, are sufficient to sustain jurisdiction and venue over United American in this district.

United American stresses that it is entirely uninvolved in all the other schemes and transactions alleged in the complaint. That is true, but without significance to the issues presented by the jurisdictional motion. As the cases cited under Point I, *ante*, indicate, the courts in 10(b) and 10b–5 cases are increasingly receptive to the concept of a common course of conduct, inspired by a single inflationary purpose, which in its implementation embraces numerous schemes and numerous documents. Given the acceptance of that concept, it necessarily follows that the jurisdiction and venue provisions of the 1934 Act extend to any defendant who is alleged to have played a significant part in any one of the several significant schemes. To hold otherwise, in a "common course of conduct" case involving different defendants in different schemes, would scatter the case among several districts. That is, in effect, the result which United American seeks to accomplish, but I reject it, as contrary to congressional intent, and the thrust of the recent cases.

### CONCLUSION

For the foregoing reasons, plaintiffs' motion for an order certifying a class is granted. Settle order and a proposed notice to class members, on five (5) days' notice.

United American's motion to dismiss the complaint is denied.

The stay of discovery into merits issues is vacated.

It is So Ordered.