George **GELMAN** et al., Plaintiffs,

v.

**WESTINGHOUSE ELECTRIC CORP.**
et al., Defendants.

George **SHULOF**, Plaintiff,

v.

**WESTINGHOUSE ELECTRIC
CORP.**, Defendant.

Paul E. **SLATER** et al., Plaintiffs,

v.

**WESTINGHOUSE ELECTRIC CORP.**
et al., Defendants.

Civ. A. Nos. 75–1070, 75–1497, 76–77.

United States District Court,
W. D. Pennsylvania,
Civ. Div.

Nov. 24, 1976.

Harold R. Schmidt, Raymond G. Hasley, Rose, Schmidt & Dixon, Pittsburgh, Pa., Edward Nathan, Berthold H. Hoeniger, New York City, Howard A. Specter, Litman, Litman, Harris & Specter, Pittsburgh, Pa., Gene Mesh, Cincinnati, Ohio, William J. Coneys, Belmar, N. J., Perry Goldberg, Specks & Goldberg, Lawrence Walner, Lawrence Walner & Assoc., Chicago, Ill., for plaintiffs.

Frank L. Seamans, J. Gary Kosinski, Eckert, Seamans, Cherin & Mellott, David B. Fawcett, Jr., David J. Armstrong, Herbert Bennett Conner, Dickie, McCamey & Chilcote, Pittsburgh, Pa., John W. Douglas, Cyril V. Smith, Jr., Covington & Burling, Washington, D. C., Frank H. Gordon, Rogers, Hoge & Hills, New York City, Steven D. McCormick, Kirkland & Ellis, Chicago, Ill., for defendants.

## OPINION

TEITELBAUM, District Judge.

These consolidated cases are purported class actions for securities fraud brought by plaintiffs against Westinghouse Electric Corporation and certain of its officers and agents (hereinafter referred to collectively as "defendants") primarily under Section 10(b) of the Securities Exchange Act of 1934 (15 U.S.C. § 78j(b)) and Rule 10b–5, promulgated thereunder (17 C.F.R. § 240.-10b–5).[1]

The litigation, presently before the Court on plaintiffs' motions for class action determination under Rule 23(c) of the Federal Rules of Civil Procedure, arises out of events leading up to and surrounding Westinghouse's sale of its Major Appliance Division (MAD) to White Consolidated Industries (WCI) in December of 1974.

Plaintiffs' essential contention is that Westinghouse, through various alleged non-

---

[1] Plaintiffs Gelman and Mann (C.A. No. 75–1070) also assert causes of action pursuant to an alleged violation of "duties of loyalty and trust and full disclosure to the [stockholder] [c]lass;" plaintiff Shulof (C.A. No. 75–1497) also asserts causes of action arising pursuant to "breach of common law fiduciary and other duties owed by a corporation to its stockholders" and "common law fraud and deceit;" plaintiff Slater (C.A. No. 76–77) also asserts causes of action pursuant to Sections 14 and 20 of the Securities Exchange Act of 1934, the rules promulgated thereunder and "principles of common law."

disclosures and misrepresentations of the company's purportedly formulated intention to divest itself of MAD and its negotiations with WCI for that ultimate purpose, artificially depressed the market price of its own common stock during the eight-month period from May 2, 1974 through December 30, 1974. Plaintiffs accordingly seek certification as representatives of a Rule 23(a) and (b)(3) class comprised of all individuals who sold shares of Westinghouse common stock between May 2 and December 30, 1974, inclusive.

While the precise number of persons who sold Westinghouse shares during the stated period is not presently known, the defendant company's records indicate that there were some 22,763 transfers of shares of Westinghouse common stock between the relevant dates. It is therefore reasonably assumed that the proposed class of former shareholders in this case numbers in the thousands.

## I. FACTUAL BACKGROUND

Westinghouse is a Pittsburgh-based Pennsylvania corporation. Its common stock, approximately 87-million shares of which are outstanding, is listed for trading on the New York Stock Exchange and other national stock exchanges, and is registered with the Securities and Exchange Commission pursuant to Section 12(b) of the Securities Exchange Act of 1934.

Westinghouse was engaged in the major appliance business from 1954 through 1974. From 1954 through 1973, MAD incurred cumulative pre-tax losses of approximately 47.4 million dollars, exclusive of the cost of investment in the domestic major appliance business. The corporation's share of the total United States' domestic major appliance business declined by approximately 40% between 1958 and 1973.

Plaintiffs aver that by the end of November, 1973, Westinghouse began to consider the sale of its major appliance business, and, by December 5, 1973, had established the Major Appliance Advisory Board to study possible courses of action which the company might take concerning MAD.

In April, 1974, MAD's losses were projected as being approximately $20-million for the current fiscal year, when, according to plaintiffs, it was known that losses would be over $40-million, as was reported in December, 1974. Plaintiffs contend that MAD's losses became a substantial and material portion of the reduction of per share earnings of Westinghouse during 1973 and 1974, but that the impact of this losing division was concealed.

By May 2, 1974, Westinghouse officials met with the Chairman of White Consolidated Industries (WCI) to discuss, *inter alia,* WCI's acquisition of certain MAD technology. The meeting allegedly resulted in further discussions and negotiations, including the exchange of proposals relative to WCI's acquisition of MAD. During the course of these negotiations, in early June, 1974, Westinghouse publicly announced its intention to spend $73-million to improve its major appliance business.

Plaintiffs claim that by early July, 1974, corporate officers had become concerned about possible news leaks regarding the exchanges with WCI, but chose to follow a course of continued concealment, rather than disclosure.

On August 5, 1974, three senior MAD officials made presentations to field personnel of the major appliance business in four cities in the United States. Although the presentations involved Westinghouse's intentions concerning MAD, allegedly no mention was made of the possibility of its sale. In fact, plaintiffs assert, the presentations—repeated in writing and distributed to trade publications and various newspapers, including the Wall Street Journal—affirmatively and falsely represented that there was "proof positive" that Westinghouse was in the major appliance business "to stay." Plaintiffs contend that thereafter, on August 7, 1974, when a Wall Street Journal reporter contacted a Westinghouse official and specifically asked about the press release and any corporate intention to liquidate MAD, the Westinghouse official failed to disclose the on-going negotiations

or the possibility of liquidation, and stated again that Westinghouse was "in the major appliance business to stay." It is alleged that at no time did Westinghouse ever disclose that it had decided not to expend $73-million to improve the major appliance business, as previously announced. As the result of Westinghouse's press releases and the averred misstatements of the Westinghouse official to the Wall Street Journal, the Journal and other newspapers publicly reported Westinghouse's announcement of its intention to remain in the major appliance business and to invest millions of dollars in this losing corporate business venture.

By December 27, 1974, a final sales agreement was executed by Westinghouse and WCI concerning the sale of MAD, and Westinghouse publicly announced the sale on December 28, 1974. It is alleged that at no time prior to the announcement was there any public disclosure of the discussions with WCI.[2]

On December 30, 1974, the first trading day after the public announcement concerning the sale of MAD, Westinghouse's common stock increased to $9½ from $8⅜, the close of the New York Stock Exchange on December 27. By January 13, 1975, the stock was selling for $11⅝. Thereafter, the price rose to nearly $20 per share. The price of Westinghouse's common stock increased by approximately 38.8% between December 27, 1974 and January 13, 1975, while the Dow Jones Industrial Average during that same period increased by approximately 8.6%.

Plaintiffs' theory is that this "dramatic" short-term price increase was attributable to the disclosure of the fact that Westinghouse was divesting itself of the financially troublesome MAD, retention of which had been depressing the stock's price. Thus, stockholders who sold between the May 2–December 30 nondisclosure period sold at an artificially deflated price and, consequently, were damaged. Had the facts been disclosed earlier, it is argued, plaintiffs would have waited to measure the disclosure's impact on the market before selling, thereby gaining the ability to sell at a higher price.

On August 27, 1975, plaintiff Gelman commenced this action as a class action and filed his motion for class action determination. The two consolidated cases were initialed shortly thereafter, and subsequently were transferred to this district pursuant to 28 U.S.C. § 1404(a). Each suit was filed as a class action.

The parties have extensively and ably briefed the question of the propriety of class certification in the circumstances of this rather complex litigation. Additionally, the Court has heard oral argument on the issue. After due consideration of the parties' respective positions, and for the reasons stated below, plaintiffs' motions for class action determination will be denied.

## II. THE 23(b)(3) DETERMINATION

■ I recognize and have considered the significant body of law indicating that securities fraud cases under Section 10(b) and Rule 10b–5 are appropriate for class action treatment.[3] I am also mindful of the teaching of the Court of Appeals for the Third Circuit in *Kahan v. Rosenstiel,* 424 F.2d 161, 169 (1970), that " 'in a doubtful [securities fraud] case . . . any error, if there is to be one, should be committed in favor of allowing the class action.' " (quoting *Esplin v. Hirschi,* 402 F.2d 94, 101 (10th Cir. 1968)).

---

**2.** It is also alleged that in December, 1974, Westinghouse purchased shares of the company's stock for its employee stock purchase and option plans, while the employee in charge of making these purchases knew of the purported plan to sell the major appliance business. It is to be noted, however, that these allegations relate only to a very short period of time, and would affect only a small portion of the purported class; also, it appears that none of the

Westinghouse individual defendants would have benefited personally from these actions.

**3.** See, *e. g., Kahan v. Rosenstiel,* 424 F.2d 161, 168–169 (3d Cir. 1970) (citing cases); *In re Goldchip Funding Co.,* 61 F.R.D. 592, 593 (M.D. Pa.1974); *Tober v. Charnita, Inc.,* 58 F.R.D. 74, 81 (M.D.Pa.1973); *Bleznak v. C.G.S. Scientific Corp.,* 61 F.R.D. 493, 496 (E.D.Pa.1973); *Dolgow v. Anderson,* 43 F.R.D. 472, 488 (E.D.N.Y. 1968).

■ But to say that Rule 10b–5 suits are generally or generically fit for class treatment is not to say that this particular case is on its facts suitable for the same. The possibility that the question *sub judice* may be debatable—or that plaintiffs' arguments in support of class certification resemble those which have been deemed persuasive elsewhere [4]—does not render the case so "doubtful" as to require or even warrant decision by comfortable recourse to the broad policy grounds noted in *Kahan v. Rosenstiel, supra,* some six years ago.

■ The question here is whether a specific controversy is adapted to resolution by means of the class action device described in Rule 23. That question obviously must be answered contextually, with reference to the circumstances of the case. General precedent offers a modicum of guidance; but undue reliance thereon, either direct or as basis for characterizing the present issue as "doubtful" (and therefore subject to the *Kahan* Court's admonition), would ultimately amount to an abdication of the Court's duty to exercise its informed discretion in this matter. It is from this attitudinal premise that we approach the particulars of this litigation and the specific requirements of Rule 23.

Rule 23 provides in pertinent part as follows:

"(a) Prerequisites to a Class Action. One or more members of a class may sue or be sued as representative parties on behalf of all only if (1) the class is so numerous that joinder of all members is impracticable, (2) there are questions of law or fact common to the class, (3) the claims or defenses of the representative parties are typical of the claims or defenses of the class, and (4) the representative parties will fairly and adequately protect the interests of the class.

"(b) Class Actions Maintainable. An action may be maintained as a class action if the prerequisites of subdivision (a) are satisfied, and in addition:

\* \* \* \* \* \*

"(3) the court finds that the questions of law or fact common to the members of the class predominate over any questions affecting only individual members, and that a class action is superior to other available methods for the fair and efficient adjudication of the controversy. The matters pertinent to the findings include: (A) the interest of members of the class in individually controlling the prosecution or defense of separate actions; (B) the extent and nature of any litigation concerning the controversy already commenced by or against members of the class; (C) the desirability or undesirability of concentrating the litigation of the claims in the particular forum; (D) the difficulties likely to be encountered in the management of a class action."

As this Court observed in *Herrmann v. Atlantic Richfield Co.,* 65 F.R.D. 585, 590 (W.D.Pa.1974):

"If the [above] requirements are compressed and pared down to their basic elements, without any conceptual overlapping, there are four items a plaintiff

---

4. See the recent decision of the Court of Appeals for the Ninth Circuit in *Blackie v. Barrack,* 524 F.2d 891 (1975), approving the district court's certification of a (b)(3) plaintiff class in circumstances bearing a resemblance to those presently before me.

Plaintiffs herein rely heavily on *Blackie* and it is therefore perhaps natural in light of my decision in this matter that the Court's initial inclination should be to undertake a detailed analysis of the Ninth Circuit's Opinion, attempting to distinguish that case from the one now at hand. Such an endeavor would not appear to be so futile as plaintiffs occasionally seem to suggest: note, for instance, the existence in *Blackie* of allegations that 'he earnings of Ampex Corporation portrayed in its financial statements and other documents had been overstated over a 27-month period through the *consistent,* improper application of several specific accounting principles (524 F.2d at 903–905).

Upon reflection, however, I do not consider that an effort to draw rather fine distinctions between the two cases would be either particularly meaningful or helpful. I have concluded that a (b)(3) class action determination would not be appropriate in the circumstances of this litigation. Insofar as *Blackie* can be read as an expression of the Ninth Circuit's preference for a different result, I simply and respectfully disagree.

must demonstrate in order to have an action certified as a Rule 23[(b)(3)] class action. These are, numerosity, superiority, adequate protection of class interests, and commonality, typicality and predominance."

In my judgment, the requirements of (b)(3) itself—predominance and superiority—must be deemed preclusive of class certification in circumstances in which a continually shifting panorama of alleged facts gives rise to a need for individualized determinations.[5]

## A. PREDOMINANCE

Maintenance of a class action under Rule 23(b)(3) requires, *inter alia,* a finding by the Court that "questions of law or fact common to the members of the class predominate over any questions affecting only individual members . . . ."

While defendants herein frequently argue against a class action determination on grounds articulated in terms of "commonality" (and, indeed "typicality"),[6] my problem with the above requirement does not stem from any real dispute with plaintiffs' preconditional assertion that questions of law or fact common to the purported class are present in this case. In the face of a broad common question—whether defendants violated Section 10(b) and Rule 10b–5 by failing to disclose decisions and events preceding the sale of MAD—I would agree with that proposition. But such agreement on my part signifies only a recognition that the class action prerequisite specified in 23(a)(2)—commonality—is satisfied here.

Certification under 23(b)(3) requires a further finding that the class-wide legal or factual questions which create (a)(2) commonality also *predominate* over any individual questions; and it is here, on this matter of predominance (or, perhaps, "predominant commonality") that I disagree with plaintiffs' argument that class certification is appropriate in the instant case.

In deciding whether common issues of law or fact predominate over issues affecting members of the proposed class on an individualized basis, the Court must determine the extent to which each of the relevant legal and factual questions affecting each member of the asserted class can be litigated on a common basis. Cf. *Katz v. Carte Blanche Corporation,* 496 F.2d 747, 756 (3d Cir. 1974).

Here, named plaintiffs argue that virtually all legal and factual questions can be litigated on a common basis because defendants allegedly were engaged throughout the relevant period in a single common course of conduct or identifiable "common scheme" to conceal , from Westinghouse stockholders the information that the company was attempting to sell its unprofitable major appliance business and was in fact negotiating with WCI for this purpose. Thus, plaintiffs submit, the claim of each member of the putative class rests upon the same legal issues and upon a common nucleus of operative facts, and can be determined without need of reference to any significant individual questions.

The problem with plaintiffs' argument is its premise—the proposition that we are

---

**5.** It is appropriate at this juncture to note in passing that defendants also challenge named plaintiffs' ability to fairly and adequately represent the interests of the proposed class (per 23(a)(4)) on various grounds, including the alleged (and occasionally apparent) antagonism between the four plaintiffs and their counsel and the questions raised by the brother-in-law relationship between plaintiff Shulof and his primary counsel. *Cf. Stull v. Pool,* 63 F.R.D. 702 (S.D.N.Y.1974). However, in view of our disposition of the predominance and superiority issues, the Court need not reach defendants' attack on the adequacy of representation in these actions.

**6.** An argument can be constructed that named plaintiffs' claims are not "typical" of those of the class, as required by 23(a)(3), because the factual circumstances pertaining at the time of their stock sales were different from those pertinent to other class members. However, at least inasmuch as the requirement of typicality does not necessitate a showing of exact identity of claims, I believe the central question here focuses on and is properly stated in terms of "predominance."

presented here with the allegation of a single act or scheme of nondisclosure persisting throughout the eight-month period, and that the claims of all class members can be adjudicated with reference to the same alleged misdeed: i. e., the nondisclosure of Westinghouse's alleged decision to sell MAD and the company's negotiations with WCI for that purpose. If that were indeed the case, the Court would perhaps be inclined to certify a plaintiff class. See, e. g., *Cannon v. Texas Gulf Sulphur Co.,* 47 F.R.D. 60 (S.D.N.Y.1969) (a market price depression case involving a class period only four days in length and a single press release). In this case, however, plaintiffs' claims are based not on a single or substantially constant misdeed, but rather on a changing, fluctuating series of alleged events beginning with the first contact between Westinghouse and WCI, continuing through their developing negotiations and ending when Westinghouse announced the execution of their final sales agreement.

As defendants observe (Defendants' Brief, Appendix C), plaintiffs allege throughout this period—during which members of the putative class sold stock at disparate points in time—no fewer than 18 separate, purportedly significant events directly related to the company's major appliance business. The relative importance of these events as they occurred at any particular time, the relative significance of the defendant company's asserted right to exercise its business judgment in deciding when to disclose information relating to MAD, and the hypothetical impact upon the market of any such disclosure, *inter alia,* would appear to have changed nearly from day to day. In these circumstances, where plaintiffs' own specific allegations outline a long series of variously significant developments relating to the defendant company's major appliance business, it is difficult to identify a single set of facts predominantly common to the entire eight-month period upon which the issue of liability to each member of the proposed seller class can be litigated.

Thus, even without regard to the existence *vel non* of what might be deemed inherently individual liability issues,[7] the cause of action possessed by an individual who sold Westinghouse shares early in May, 1974, shortly after the alleged initial contact with WCI, and the cause of action possessed by an individual who sold late in December, 1974, allegedly after all major impediments to the signing of the sales agreement in question had been removed, would appear to be substantially different in terms of, *inter alia,* both Westinghouse's obligation at any point in time to publicly disclose information concerning MAD and the materiality of the changing relevant circumstances in light of which that obligation must be considered. The same would be true of any causes of action based on facts existing as of other dates or based on the June 5, August 5 or any other corporate statement.

■ In sum, the facts relevant to any particular seller's claim are the facts existing at or near the time of his individual sale, and these facts are sufficiently different from those relevant to the large majority of the other members of the putative selling class to warrant the conclusion that questions lying at the heart of each claim— the extent of the company's duty to disclose, the materiality of the alleged nondisclosures and even the various defendants' intent or "scienter" (see *Ernst & Ernst v. Hochfelder,* 425 U.S. 185, 96 S.Ct. 1375, 47 L.Ed.2d 668 (1976))—will require substantially individualized determinations. In such circumstances, some degree of commonality may be discerned. But in my judgment, that "predominant commonality" required by 23(b)(3) cannot be.

---

7. Although various misrepresentations by defendants are alleged, the Court assumes the validity of plaintiffs' assertion that this is primarily a non-disclosure case, and that individual showings of reliance are therefore not prerequisite to recovery. See *Affiliated Ute Citizens v. United States,* 406 U.S. 128, 153–154, 92 S.Ct. 1456, 31 L.Ed.2d 741 (1972). It is noted that the necessity of individual showings of coercion recently was deemed to obstruct a finding of predominance in the context of an antitrust tying case. *Ungar v. Dunkin' Donuts of America,* 531 F.2d 1211 (3d Cir. 1976).

The Court does not wish to belabor this matter. However, in order to demonstrate clearly the problem identified above, we turn briefly to the issue of "materiality" as it pertains to the instant case.

■ Essential to recovery under Rule 10b–5 is a finding of nondisclosure or misrepresentation of a "material" fact. In *Rochez Bros., Inc. v. Rhoades,* 491 F.2d 402, 408 (3d Cir. 1973), the Third Circuit defined materiality in a Rule 10b–5 context as follows:

> "The test of the materiality of undisclosed or misrepresented facts is basically an objective one—i. e., whether 'a reasonable man would attach importance [to them] in determining his course of action in the transaction in question.'" (citations omitted).

■ The issue of materiality is thus one of fact to be determined on the basis of all the circumstances;[8] and in this case, the relevant facts as alleged by plaintiffs changed throughout the selling class period. Clearly, the question of materiality as it pertains to the claim of a shareholder who sold stock in May or June is vastly different from the question as it pertains to claims stemming from sales in November or December.

■ Moreover, plaintiffs' principal allegation appears to be that Westinghouse failed to disclose a contingency—that is, that the corporation might divest its major appliance business at some time in the future, depending on the outcome of its negotiations with WCI. Where, as here, facts relating to a future event are involved, materiality also depends ". . . upon a balancing of both the indicated probability that the event will occur and the anticipated magnitude of the event in light of the totality of the company activity." *SEC v. Texas Gulf Sulphur Co.,* 401 F.2d 833, 849 (2d Cir. 1968). During the relevant selling period, discussions and negotiations with WCI concerning the major appliance divi-

sion fluctuated among various stages of development and uncertainty, thereby variating the "indicated probability" that the sale of MAD would occur.

Indeed, defendants assert (and the depositions of individual defendants Lynch and Burnham indicate) that until late December, various major questions bearing on the likelihood of a sale of MAD remained unresolved—including those related to the use of the Westinghouse trademark, the inclusion of foreign subsidiaries in the transaction, the transfer of pensions and other employee benefits and the prospects for receipt of the necessary antitrust clearance. Accordingly, defendants apparently will contend that, under applicable legal standards, the undisclosed events at Westinghouse relating to the major appliance business did not attain a "material" statute at any time prior to December 27, 1974.

■ The merits of this position aside, it would seem clear that the issue of materiality relevant to any purported class member's nondisclosure claim is highly individualized (if not wholly individual to him), because it involves only those continuously changing facts and corporate judgments pertaining at or near the date of his sale. In my view, this necessity of individualized or nearly individualized determinations with respect to the crucial issue of materiality is alone sufficient to preclude a finding that common questions predominate.

## B. SUPERIORITY

It is in large measure this lack of predominance explicated above that impels the Court's additionally disabling conclusion that a class action is not ". . . superior to other available methods for the fair and efficient adjudication of the controversy."

This proposition has a self-evident aspect—an absence of predominant common questions renders a class action inappropri-

---

8. See, *e. g., SEC v. Shapiro,* 494 F.2d 1301, 1306 (2d Cir. 1974); *Radiation Dynamics, Inc. v. Goldmuntz,* 464 F.2d 876, 888 (2d Cir. 1972) (materiality "must be determined on a case-to-case basis according to the fact pattern of each specific transaction").

ate in part because it would be an inferior means of adjudication in such circumstances. Accordingly, I do not think it necessary that we dwell on the superiority issue. Suffice it to say that it is apparent from the foregoing discussion that, in my view, the individual claims of the members of the putative class are fundamentally divergent, and that, for this reason, a class action would not only operate to deprive such members of their arguable interest in "individually controlling the prosecution" of their own claims, Rule 23(b)(3)(A), but would also in all probability disintegrate into a myriad of individualized claims, destroying the cohesiveness of the litigation and rendering it entirely unmanageable. Rule 23(b)(3)(D).

As previously indicated, plaintiffs will have to present evidence probative of several separate legal issues, including scienter, "in connection with the sale of securities," materiality and damages. Were a single plaintiff to prosecute his case against Westinghouse solely on his own behalf, the issues involved would not be uncomplicated; but the case obviously would be manageable in that the parties, court and jury could focus on the events operative at or near a single point in time—i. e., the date on which that particular plaintiff sold his stock. The relevant factors would include, *inter alia,* the events at Westinghouse, the intent of each Westinghouse official, the status of the discussions with WCI, the materiality of these events and the various forces affecting the market.

Expanding this litigation to consider the claims of three additional plaintiffs obviously compounds the complexity of the case, requiring the Court and jury, as well as the parties, to focus on five separate points in time and five different sets of facts.[9] In this posture, the case will be difficult, albeit not unmanageable.

However, certification of these cases as a class action encompassing thousands of selling shareholders would expand the litigation beyond all reasonably controllable bounds, forcing the parties, court and jury to consider the events operative on nearly each day of the relevant eight-month period. Such an endeavor clearly would be overwhelming. Its prospects for fairness and efficiency are shadowed by the spectre of litigation degenerating into a snarled welter of confusion. On both counts, I consider that these consolidated cases would be unmanageable as a class action. For this reason, and because I believe the interests of fairness and efficiency will be better served by resort to the "test case" approach and its attendant features—principally the opportunity for adjudication of at least similarly situated individual claims on principles of collateral estoppel and *stare decisis* (see *Katz v. Carte Blanche Corporation, supra,* 496 F.2d at 758–761)—I find that implementation of Rule 23 is not a superior method of adjudicating the instant controversy.

In consideration of the foregoing discussion, the Court finds that the requirements of Rule 23(b)(3) are not satisfied herein. Accordingly, plaintiffs' motions for class certification will be denied.

An appropriate Order shall issue.

---

**9.** Some members of the purported class, including named plaintiff Mann, apparently both bought and sold stock within the class period. Assuming a finding that the price of Westinghouse common stock was artificially depressed during the course of the period to certain varying extents, the jury would have to determine which of the members purchased stock during the class period and to what extent their recovery, based on their sale, must be reduced by the amount of market deflation existing at the time of their purchase.