Manuel **RODRIGUEZ**, et al., Plaintiffs,

v.

**UNITED STATES DEPARTMENT OF the TREASURY, et al., Defendants.**

Civ. A. No. 85–0886–AER.

United States District Court,
District of Columbia.

Feb. 25, 1990.

Mark A. Venuti, Bart F. Stichman, Nat. Veterans Legal Services Project, Peter J. Carre, Peter Carre & Associates, Washington, D.C., for plaintiffs.

John C. Cleary, Linda A. Halpern, U.S. Attys. Office, Washington, D.C., for defendants.

## MEMORANDUM

AUBREY E. ROBINSON, Jr., Chief Judge.

This matter comes before the Court on plaintiffs' Motion for Class Certification. In March of 1985, plaintiff Manuel Rodriguez brought suit against the Department of the Treasury, alleging that the Uniformed Division ("U.D.") of the Secret Service discriminated against him and others similarly situated by rejecting or discouraging the application for employment by recovered asthmatics. Later that year, Rodriguez moved for class certification,[1] which motion the Court denied. 108 F.R.D. 360. On motion for reconsideration, the Court withdrew the denial and ordered discovery on the issue. Following discovery, Rodriguez renewed his motion that the proposed class be certified.

On February 28, 1989, the Court granted in part and denied in part Rodriguez' motion to amend his complaint, permitting him to join two additional plaintiffs. On July 14, 1989, the Court asked that plaintiffs renew their motion within 20 days, lest it decide the motion on the papers previously filed. Plaintiffs responded with an additional "Supplement to Motion for Class Certification," defendants responded and plaintiffs replied to that response. Most recently, defendants filed a sur-reply in opposition, bringing the total number of briefs placed before the Court by the parties on this issue to nine.

After considering the various arguments of the parties, and determining the proper bounds of any class under the circumstances, the Court concludes that plaintiffs' have failed to satisfy the numerosity requirement for class certification under Federal Rule of Civil Procedure 23. In the alternative, the Court finds that no member of the class has exhausted the necessary administrative remedies in a timely fashion. Consequently, plaintiffs' motion must fail.

## I. BACKGROUND

### A. *The Medical Standards*

All applicants for U.D. positions with the Secret Service are required to take and pass rigid physical examinations. The medical standards applicable to these examinations during the relevant period were based on standards adopted by the District of Columbia Board of Police in 1958. These standards identify "asthma or a history thereof" as one of several "causes for reject[ing]" an applicant for medical reasons. Def.Opp., Feb. 27, 1987, at 4.

Up until 1981, according to defendant, the medical profession considered asthma to be a "longstanding chronic problem." *Id.* at 6. Sometime in 1981, apparently based on the more current theory that asthma is predominately due to allergies, this thinking changed, as "allergy clinics began using much more potent allergens, which they would administer over a two year period, in the hope that this treatment would result in the patient's complete desensitization." *Id.*

Although it was not until 1988 that the applicable medical standards were officially revised,[2] the Board administering the examinations had allegedly modified them in practice. For example, the 1958 MPD standard also stated that "a history of hay fever or other allergies is cause for rejection," but the Board does not consider hay fever and allergies before age 12 as disqualifying. This exception, which does not appear in the standards, has been applied since 1972. Def.Opp., Feb. 27, 1987, at 6. It seems that a similar before–age–12 exception to the asthma standard was informally adopted in 1983, perhaps in response

---

1. Plaintiff Rodriguez sought, and plaintiffs continue to seek certification of a class of "all recovered asthmatic applicants and potential applicants who were rejected, or discouraged from applying for, Uniformed Division positions with the U.S. Secret Service by the Uniform Division Medical Standards, which disqualify applicants because of a medically reported 'history of asthma.'" Plaint.Mot., Jan. 12, 1987, at 1.

2. Defendants state that a new set of medical standards were approved for use on March 25, 1988. The new standard for asthma does not disqualify individuals unless they have a reduced pulmonary function as a result of the illness. Def.Opp., Feb. 27, 1987 at 2; Def.Resp. to Plaint.Supp., Sept. 25, 1989, at 2 n. 2.

to Rodriguez's complaint challenging the standard. *See id.* at 6 n. 5 (reporting testimony of Dr. Chin Lee that he ultimately applied before–age–12 exception to asthmatics).

B. *The Application Process Generally*

Regardless of the Department of the Treasury's current hiring practices, the following appears to have been the procedure while the allegedly discriminatory policy was in place. Persons who expressed interest in applying for U.D. positions were required to submit two 3×5 cards containing their name, address and phone number. A few weeks before the recruiting cycle, a U.D. officer contacted those who had submitted these cards, advising them of the test date and supplying them with forms to complete prior to the test. Prior to 1982, according to plaintiffs, an "Applicant Information" sheet referred to asthma as a potentially disqualifying condition. Sometime in 1982, the Service began to send a "Dear Applicant" letter which contained a list of disqualifying medical conditions, including asthma. The U.D. no longer includes this list in its "Dear Applicant" letter, but it is unclear when it ceased the practice; it is clear that the practice continued into 1985.[3]

All applicants then took a standardized test, which was scored immediately. Approximately eighty percent of the test-takers passed. Passing test-takers then entered the medical screening phase. There, non-medical personnel administered eyesight and hearing tests and, where appropriate, checked an applicant's blood pressure. They also discussed the "applicant information sheet" with the applicant. "Applicants found to have medical conditions which in the opinion of the medical screener are disqualifying [were] so advised." *Id.* at 8.

Although medical screeners advised applicants of disqualifying conditions, they were instructed to allow applicants the option of continuing in the face of this advice;

as a technical matter, only the Board could reject an applicant on medical grounds. Nonetheless, defendants concede that some medical screeners did not afford some applicants the option of continuing. Following the medical screening, applicants entered the interview phase. The interviewers rated the applicant based on ten factors: employment record; attendance and punctuality; legal; interest in law enforcement; interest in U.D.; reaction to uniform and weapons; appearance; maturity; speech; and writing. The interviewers also had the opportunity to comment generally, in writing, on a candidate. These comments often mentioned a candidate's medical history as posing a potential problem.

Those who survived the interview process then took a physical examination at the Police and Fire Clinic; out-of-town applicants received a copy of the medical standards and forms for completion by the physician of their choice. The Secret Service then subjected those who passed the physical examination to an extensive background check, for the requisite top secret clearance.

C. *Rodriguez' Application and Administrative Complaint*

On February 22, 1982, Rodriguez took and passed the U.D. examination. He alleges, and defendants do not dispute, that he was advised at the medical screening that his history of childhood asthma was disqualifying; whether or not he was given the option to proceed to the interview stage, there is no dispute that he was not interviewed.

In June of 1983, at the instigation of his brother-in-law who himself had brought suit against the Secret Service, Rodriguez contacted an attorney. The attorney advised him to contact the Secret Service about reapplying. Rodriguez called the recruiting officer and told him of his prior rejection and inquired about the medical

---

3. The record includes a copy of a letter sent to applicants in connection with the November 1985 examination listed the asthma standard as a disqualifying condition. The letter defendants supplied to support their assertion that they no longer advise potential applicants of disqualifying medical conditions in its "Dear Applicant" letter, is a letter used to advise applicants of the January 1987 test.

standards. He was told that they had not changed since he last applied. Consequently, Rodriguez claims, he did not reapply.

Shortly thereafter, Rodriguez contacted an EEO officer, and ultimately filed an administrative complaint with the Secret Service. In it, he sought individual relief and did not mention class relief. In December, 1983, with the cooperation of the Treasury Department's Equal Opportunity Program, Rodriguez amended his complaint to seek class-wide relief. Meanwhile, in late August 1983, the EEO counselor attempted to resolve Rodriguez' claim by offering him an opportunity to take the physical examination and complete the application process. Rodriguez rejected this offer, apparently because it did not include an offer of back-pay.

Eventually, the informal pre-complaint counselling proved fruitless. On April 2, 1984, Rodriguez was given notice of his right to file, and within the required time, Rodriguez did file a formal class complaint that was eventually rejected by the EEOC. Rodriguez then instituted this action.

D. *The Extent of the Class Proposed*

Following the Court's vacation of the order denying class certification, and following extended discovery, Rodriguez filed his renewed motion for class certification. Rodriguez believes his proposed class is quite numerous. Based on review of applicant files, covering about one-half of 1982 applicants and presumably all applicant files for the period 1983 to July, 1986, Rodriguez alleges, and defendants apparently concede, that 21 applicants were rejected because they reported a medically diagnosed past history of asthma. Plaint. Mot., Jan. 12, 1987, at 5; Defendants' Opp., Feb. 27, 1987, at 23.

In addition, 77 other rejected applicants had reported a history of childhood asthma, although the Service gave other reasons for the rejection—some medical, some non-medical. Plaint.Mot., Jan. 12, 1987, at 7; Def.Opp., Feb. 27, 1987, at 18. Rodriguez contends, of course, that these individuals were "undoubtedly actually rejected because of" their asthma.

Rodriguez also claims that prior to 1982, the number of rejections is even higher. Records for that period were not available, but Rodriguez cites the affidavit of John Hagmeyer, who was recruiting sergeant from April 1981 to March 1982. Hagmeyer stated that he personally rejected 50 applicants based on the asthma standard between March, 1981 and April, 1982. Approximately half of these "rejections" appear to have actually been discouraged applicants, told over the phone about the disqualifying condition before filing any formal application. Rodriguez points to these 25, and by extrapolation alleges that some 165 potential applicants between December 1978 and August 1983 were similarly discouraged from applying.

Plaintiff also points to the "Dear Applicant" letter, which the U.D. sent from 1982 to at least 1985, to attempt to establish that a significant number of persons were deterred from applying because of the discriminatory asthma standard. Similarly, Rodriguez presumes that knowledge of the published standards and "word-of-mouth" knowledge of defendants' application of the standard deterred potential applicants. In any event, early in the litigation Rodriguez predicted that additional class members would come forward once the suit was publicized.

Lastly, Rodriguez relies upon the "continuing violation" theory to permit the class to encompass applicants unlawfully rejected or discouraged prior to 1983, when Rodriguez initiated this action. In general, the theory permits recovery for a defendant's discriminatory act prior to the actionable period, so long as the illegal policy remains in place into that period. A class may not normally contain members with otherwise stale claims. Those for whom the statute of limitations had run prior to Rodriguez' action would be barred. Application of the continuing violation theory, however, would allow these individuals to participate and increase the numerosity of the class.

Defendants deny that the class is so numerous that joinder would be impracticable, as required by the Federal Rules. De-

fendants assert that 21 rejected applicants is simply too small a number to constitute a class. They would exclude the 77 applicants who reported asthma but who were rejected for other reasons claiming that if non-medical reasons justify rejection the medical standard is irrelevant. Defendants contend that Rodriguez has not produced a single affidavit from a person who claims to have been discouraged from applying because of the asthma standard. Lastly, Defendants reject the idea that the continuing violation theory applies to the situation presented by plaintiff's proposed class.

### E. *Joinder of Foscaldi and Hayden*

To ensure that representative plaintiffs were unquestionably typical of the class, Rodriguez recently sought and received leave to join two additional named plaintiffs. Plaintiff John Foscaldi applied in May, 1983, reporting asthma through age seven. He went on to undergo a medical screening. The technician commented in Foscaldi's file that he "[h]ad Asthma up to age of 7 per Parents (no records)." He went on to the interview and received a failing score of 65. The interviewers' comments mentioned Foscaldi's credit problems, including a bankruptcy, and two hardship discharges from military service due to personal problems. In addition, the interviewers noted Foscaldi "indicated he had asthma from birth to the age of 7 years, but there are no hospital records...." *See* Def.Resp. to Plaint. Supp., Sept. 25, 1989, at 7–8.

Plaintiff Robert Hayden applied in November, 1985. In the applicant questionnaires, Hayden indicated that he had allergy shots through age 17, two broken bones and poor vision. He passed the written exam and interview stages of the application process, and went on to a medical screening. There, an examiner noted that Hayden had 20/40 vision, and "allergy shots to age 17." He was rated "Questionable—Medical Clearance Needed."

Defendants also received Hayden's medical records from his teenage years, which outlined Hayden's treatment at ages 15 and 17 with desensitization serum to combat

allergies. Hayden had "bronchial asthma," which was treated from 1971 to 1981. Hayden's last "episode of allergic attack" occurred in 1981. On April 23, 1986, the Police and Fire Clinic rejected Hayden on the grounds of asthma. *See id.* at 12–15.

Neither Foscaldi nor Hayden pursued administrative remedies prior to joining this litigation. *See id.* at 11, 15.

## II. DISCUSSION

### A. *The Class Is Insufficiently Numerous*

The Court is of the view that plaintiffs have failed to establish the existence of a certifiable class in this case. Under Federal Rule of Civil Procedure 23, a party may maintain a class suit if the class is so numerous that joinder is impracticable, if there are common questions of law or fact, if the parties' claims are typical of the class claims, and if the representatives of the putative class will fairly and adequately represent the interest of the class. Fed.R. Civ.Pro. 23(a). In addition, the proposed class must satisfy one of the subdivisions of Rule 23(b). In this case, plaintiffs suggest that 23(b)(2) is appropriate, i.e., that the U.D. has "acted or refused to act on grounds generally applicable to the class, thereby making appropriate final injunctive relief or corresponding declaratory relief applicable with respect to the class as a whole."

Plaintiffs' effort founders fundamentally on the first of these requirements, numerosity, because for various reasons three sub-classes cannot be included. The Court concludes that the class proposed by plaintiffs is not so numerous as to make joinder impractical because of a determination that the class cannot include allegedly deterred applicants, applicants who reported a history of asthma but were rejected on other grounds and applicants who were rejected prior to the commencement of the charging period. As the exclusion of the last of these groups makes clear, the Court rejects the idea that the continuing violation theory applies to expand the proposed class here, as plaintiffs have argued.

These sub-groups will be addressed each in turn.

### 1. Deterred Applicants

Plaintiffs assert that the class should include those would-be applicants who were discouraged from proceeding in the U.D. hiring process once informed that asthmatics would be subject to rejection. The Secret Service conveyed the medical standard to persons interested in applying in two ways: through the "Dear Applicant" letter and also over the telephone.

In *Teamsters v. United States*, 431 U.S. 324, 97 S.Ct. 1843, 52 L.Ed.2d 396 (1977), the Supreme Court held that a formal application for employment is not a condition precedent to relief from unlawful discrimination where the "application would have been a useless act serving only to confirm a discriminatee's knowledge that the job he wanted was unavailable to him." *Id.* at 367, 97 S.Ct. at 1870. As the Court pointed out in an earlier Order, some courts have included within a class those persons who were discouraged from applying based upon the knowledge that the discriminatory policy was in place. *See Rodriguez v. Department of the Treasury*, 108 F.R.D. 360, 363 (D.D.C.1985) (citing *Phillips v. Joint Legislative Committee etc.*, 637 F.2d 1014, 1022 (5th Cir.1981), *cert. denied*, 456 U.S. 960, 102 S.Ct. 2035, 72 L.Ed.2d 483 (1982); *Christman v. American Cyanamid Co.*, 92 F.R.D. 441, 447 (N.D.W.Va.1981)). For two reasons however, the Court affirms its earlier conclusion that certification including deterred applicants here would be unwise.

### a. *The Deterred Sub–Class Remains Speculative*

■ First, the Court believes that the existence of a substantial group of deterred applicants remains speculative following plaintiffs' discovery, just as found initially. True, the difficulty in identifying potential class members makes joinder of those individuals impractical. Nonetheless, plaintiffs must present some credible evidence that a respectably numerous group of deterred applicants actually exist. Leaving aside the pre–1982 period for the mo-

ment, for which defendants apparently have no records, plaintiffs did examine all of defendants records for 1982–1986. In addition, plaintiffs deposed a number of Service officials involved in the application process. Yet plaintiffs now offer little more than a suggestion that the Court engage in speculation and conjecture to determine that large numbers of deterred persons exist.

There are two methods by which defendants are alleged to have deterred applicants; by telephone and via the "Applicant Information" sheet and "Dear Applicant" letter. With respect to the alleged telephone rejections, plaintiffs point to Sgt. Hagmeyer's testimony that during a twelve month period in 1981–82 he informed 25 persons of the medical standard. From this, plaintiffs would have the Court extrapolate for the 1978–83 period to arrive at a figure of 165 deterred individuals. Defendants' point is well taken, however, that if during the depositions of Hagmeyer's successors (Lt. Conroy and Sgt. Rich), plaintiffs had made a similar inquiry about "telephone rejections" there would be no need to extrapolate.

Next, with regard to the "Applicant Information" sheet and "Dear Applicant" letter, plaintiffs claim that

> *some percentage* of the 13,635 would-be applicants who sent in 3″ by 5″ cards from October, 1980, to July, 1986, but did not continue the process, discontinued in deference to the S.S. representation that continuance would be futile because of a history of asthma. Even if only 1% of this group is assumed to have been recovered asthmatics, the number of class members so discouraged is 136.

Plaint.Mot., Jan. 12, 1987, at 8 (emphasis in original). Plaintiffs offer no basis whatsoever for their figure of 1%. For all the Court knows, it is absolutely random, as it would have to be given the lack of evidence to support a more concrete number.

At the time plaintiffs divined the 1% figure in the belief that "some percentage" of applicants were deterred, they also believed that subsequent events would bear them out. According to plaintiffs in 1987, "[t]he

potential class members are located from Pennsylvania to Georgia and, now that the cat is out of the bag, there is a very real risk that, absent class certification here, a multitude of suits will be filed in a multitude of jurisdictions...." *Id.* at 19. Defendants report that as of September 1989, however, no subsequent administrative complaints have been filed similar to plaintiffs'.

Defendants point to plaintiffs' failure to offer even one identifiable deterred applicant. This is so even after reasonably extensive discovery and the pendency of the motion for class certification for nearly four years. Yet the failure to locate these individuals comes as no particular surprise, since inherently "such a group is indefinable and unidentifiable." *Alvarez v. City of Philadelphia,* 98 F.R.D. 286, 289 (E.D.Pa. 1983) (citing *Capaci v. Katz & Besthoff, Inc.,* 72 F.R.D. 71, 78 (W.D.La.1976)); *Morris v. City of Pittsburgh,* 82 F.R.D. 74, 76 (E.D.Pa.1979). Though Rule 23 contains no express requirement that a party define his class with specificity, the courts have held that the class definition must make it "administratively feasible for the court to determine whether a particular individual is a member." *Rios v. Marshall,* 100 F.R.D. 395, 403 (S.D.N.Y.1983) (quoting 7 C. Wright and A. Miller, *Federal Practice and Procedure* § 1760 at 581 (1972) and citing *Simer v. Rios,* 661 F.2d 655, 669 (7th Cir.1981), *cert. denied,* 456 U.S. 917, 102 S.Ct. 1773, 72 L.Ed.2d 177 (1982)). This Court declines to permit class certification to hinge in part on so speculative a group of alleged discriminatees.

### b. *The Deterred Sub–Class Destroys Commonality*

Second, and alternatively, the Court finds that the inclusion of deterred individuals would cause a shift in the litigation to predominately individual questions and render the case unmanageable. The nature of a group of deterred applicants presents a double-edged sword for putative class representatives seeking certification. Again, because of the difficulty in identifying such individuals, their joinder may be inherently impractical. But because deterred appli-

cants present decidedly singular, atypical circumstances when compared to rejected applicants, their inclusion in the class may place an unjustifiable burden upon the litigants and upon the Court. "[C]ommonality begins to be obscured by individual case histories," a problem which "merge[s] into problems of management." *In re Northern Dist. of Calif. Dalkon Shield Litigation,* 693 F.2d 847, 854 (9th Cir.1982), *cert. denied,* 459 U.S. 1171, 103 S.Ct. 817, 74 L.Ed.2d 1015 (1983).

To establish a valid claim in the instant case, a "deterred" would-be applicant would have to show that he was aware of the allegedly discriminatory medical standard, would have applied otherwise, and that the asthma standard would have resulted in his failure to qualify. Resolution of the central question, each deterred class member's state of mind, obviously would call for innumerable "mini-trials." "Although it is not rare for courts to make determinations as to the state of mind of a particular party the proposed definition would require the court to make an unmanageable number of such determinations." *Rios v. Marshall,* 100 F.R.D. 395, 403 (S.D. N.Y.1983).

In a class where efficient adjudication is predicated upon the common question of the validity of the medical standard, inclusion of persons deterred from applying would require detailed inquiry into each individual's mental state and whether other disqualifying factors might have resulted in a rejection. The focus of the class litigation with regard to these individuals would most certainly shift from defendants' conduct to the factual circumstance of individual plaintiffs. This tendency, the Court believes, outweighs any commonality and typicality established by the claims of actual applicants, and therefore, frustrates the interest of judicial economy which class litigation is designed to serve. *See Selzer v. Board of Educ.,* 113 F.R.D. 165, 167 (S.D.N.Y.1986) (citing *General Tel. Co. of Southwest v. Falcon,* 457 U.S. 147, 157 n. 13, 102 S.Ct. 2364, 2370 n. 13, 72 L.Ed.2d 740 (1982)).

**8**

### 2. Applicants Allegedly Rejected on "Mixed" Grounds

 Plaintiffs also seek to include all applicants denied employment and who indicated a history of asthma in their application. In doing so, they claim that "some, if not all, of [these] 77 applicants, from 1982–1986 ... whom S.S. lists as having been rejected or having withdrawn for other reasons, were undoubtedly actually rejected because of the U.D. asthma standard." Plaint.Mot., Jan 12, 1987, at 7.

This *ipse dixit* conclusion is little assistance to the Court in attempting to determine whether these alleged claims are amenable to class adjudication. For the same reasons of efficiency and manageability the Court applies to allegedly "deterred" individuals, the class defined by plaintiffs cannot contain individuals allegedly rejected on asthma and non-asthma grounds. These claims present myriad factual differences which, like the allegedly "deterred" applicants, would disrupt any commonality and render the class suit patently unmanageable.

The question common to the class proposed by plaintiffs is the legality of a policy which excludes applicants reporting a history of asthma. Section 504 of the Rehabilitation Act of 1973, 29 U.S.C. § 794(a), calls for a determination whether the medical condition prevents performance of the job's "essential functions" or alternatively can be "reasonably accommodated" by the employer. *School Bd. of Nassau County v. Arline*, 480 U.S. 273, 287, 107 S.Ct. 1123, 1130–31, 94 L.Ed.2d 307. Of course, before reaching this seemingly common inquiry, every section 504 plaintiff must make out a prima facie case. This threshold burden presents a situation in which the potential for common adjudication fades and individual circumstance comes to the fore.

To establish a prima facie case under the Rehabilitation Act, a plaintiff must show that (1) he is a "handicapped person" under the statute; (2) he was "otherwise qualified" for the position in question; (3) that

he was denied the position solely on the basis of that handicap; and (4) that the program or activity in question received federal financial assistance. *Daubert v. United States Postal Serv.*, 733 F.2d 1367, 1371 (10th Cir.1984).[4]

The Court is cognizant that it may not consider the merits of the representative or class claims in deciding a motion for class certification. Nonetheless, an analysis of the nature of the proof which will be required at trial is "directly relevant to a determination of whether the matters in dispute are principally individual in nature or are susceptible of proof equally applicable to all class members." *Nguyen Da Yen v. Kissinger*, 70 F.R.D. 656, 660–61 (N.D.Cal.1976); *see also Polich v. Burlington Northern, Inc.*, 116 F.R.D. 258, 261 (D.Mont.1987); *Abercrombie v. Lum's, Inc.*, 345 F.Supp. 387, 390 (S.D.Fla.1972).

Again, the manageability of the class is threatened. This consideration permeates the Rule 23 factors, but is present most certainly in assessing commonality, *In re Northern Dist. of Calif. Dalkon Shield Litigation*, 693 F.2d 847, 854 (9th Cir.1982) (problems of commonality merge into problems of management), as well as the appropriateness of certification under 23(b)(2), *Indiana State Emp. Ass'n v. Indiana State Hwy. Comm'n*, 78 F.R.D. 724, 725–26 (S.D.Ind.1978) (individual questions must not overwhelm issues of generalized equitable relief), and 23(b)(3), *Gelman v. Westinghouse Elec. Corp.*, 73 F.R.D. 60, 68–69 (W.D.Penn.1976) (individual factual circumstances would destroy cohesiveness of litigation, render case unmanageable); *see generally Montgomery v. Rumsfeld*, 572 F.2d 250, 255 (9th Cir.1978) (upholding finding that numerous factual distinctions made class unmanageable); *cf. Zenith Laboratories Inc. v. Carter–Wallace, Inc.*, 64 F.R.D. 159, 164 (D.N.J.1974) (court may decertify class upon appearance that questions of fact are "so dissimilar ... so as to render the class action unmanageable").

---

**4.** *See also Strathie v. Department of Transp.*, 716 F.2d 227, 230 (3d Cir.1983); *Doe v. New York University*, 666 F.2d 761, 776 (2d Cir.1981); *Hol-* *ly v. City of Naperville*, 603 F.Supp. 220, 229 (N.D.Ill.1985).

In the case of the applicant ostensibly rejected for non-discriminatory reasons, but reporting a history of asthma, the prima facie case is an entirely individualized burden. Like the "deterred" applicant's state of mind showing, proof that one is "otherwise qualified," *and* was denied employment because of the alleged handicap must necessarily be grounded in facts and circumstances peculiar to the applicant. Inclusion of this group would also require endless "mini-trials," and void any advantage to class resolution. Efficiency and economy would evaporate. These considerations require that this sub-group not be included in the class.

3. Individuals Rejected Because of Asthma But Who Applied Prior to the Charging Period: the "Continuing Violation Theory"

■ The reason for the earlier reconsideration of the Court's order denying class certification was the possible application of the "continuing violation" theory to include individuals unlawfully rejected but who had permitted the statute of limitations to run on their claim. Were the Court to incorporate this group of alleged discriminatees into the class, the numerosity requirement might well be met. The Court holds, however, that the theory does not apply to rejected applicants.[5] As a result, individuals allegedly rejected unlawfully prior to March 10, 1983 cannot be included for purposes of the numerosity assessment.

The Court must define any class within the jurisdictional limits of the Rehabilitation Act and relevant regulations. Leaving aside the continuing violation theory for the moment, an applicant is eligible to participate in any class relief only if he was discriminated against within a period commencing 90 days prior to the day a class member first contacts an EEO officer. *See Laffey v. Northwest Airlines, Inc.*, 567 F.2d 429, 472 (D.C.Cir.1976), *cert. denied*, 434 U.S. 1086, 98 S.Ct. 1281, 55 L.Ed.2d 792 (1978); *Christman v. American Cyanam-*

*id Co.*, 92 F.R.D. 441, 447 (N.D.W.Va.1981); *see also* 29 C.F.R. § 1613.602(a) (1983) (prescribing time limit for contacting EEO officer following handicap discrimination—since reduced to 30 days).

Rodriguez, the only named plaintiff to file a formal complaint, did so on April 9, 1984. He first contacted an EEO counselor on June 10, 1983. As was noted in the Court's Memorandum denying class certification originally, "the earliest backward cut-off date for this class action would therefore be March 10, 1983," assuming without deciding that Rodriguez himself had acted in a timely fashion. From this date forward, plaintiffs have identified 21 applicants denied employment on the basis of asthma. To include those unlawfully denied employment prior to this date, plaintiffs rely on the continuing violation theory.

In order to invoke the continuing violation theory, a plaintiff must show "a series of related acts, one or more of which falls within the limitations period, or the maintenance of a discriminatory system both before and during the [limitations] period." *McKenzie v. Sawyer*, 684 F.2d 62, 72 (D.C. Cir.1982) (quoting *inter alia* B. Schlei & P. Grossman, *Employment Discrimination Law* 232 (Supp.1979)). The continuing violation theory permits plaintiffs to recover based on acts falling outside the actionable period, as long as they are able to show discrimination within the actionable period. *McKenzie*, 684 F.2d at 72.

Take for example an employer who, pursuant to an illegal policy, refuses to promote an individual in 1987, and then does so again in 1989 pursuant to that same policy. Under the theory, if the employee filed a complaint in 1989, he might also recover the back pay he would have received had he obtained the 1987 promotion, despite the fact that the 1987 claim would have otherwise been time-barred.

Although not always explicit in the cases applying the theory, it is reasonably clear to this Court that a plaintiff seeking to

---

5. As the Court has already determined that those allegedly deterred from applying cannot be included in the class, it offers no opinion on

the application of the "continuing violation" theory to that group.

recover for otherwise "stale" claims must also show that he was aggrieved by the continuing violation within the actionable period. *See Domingo v. New England Fish Co.,* 727 F.2d 1429, 1443 (9th Cir.1984) ("as a prerequisite to obtaining relief, each class member must demonstrate, by fact of employment or otherwise, that he or she had been discriminated against during the limitation period or was a member of a group exposed to discrimination during that time") [6]; *see also McKenzie,* 684 F.2d at 72 n. 8 (error to include past employees who had left defendant's employ more than 30 days prior to filing of complaint as members of the class of past employees); *Shehadeh v. Chesapeake v. Potomac Tel. Co.,* 595 F.2d 711, 726 (D.C.Cir.1978) (if plaintiff "cannot adduce proof tending to show the existence of a pattern of interference extending into the January filing period, she may ... be barred from seeking recovery for earlier infractions").

The requirement that the plaintiff be aggrieved by the continuing violation forms a necessary corollary to the rule that persons cannot "utilize the continuing violation theory to resurrect claims about discrimination concluded in the past, even though its effects persist." *McKenzie,* 684 F.2d at 72; *see also Laffey v. Northwest Airlines, Inc.,* 567 F.2d 429 (D.C.Cir.1976) (error to include in class of present and past employees whose claims were time-barred because they left company prior to charging period); *Wetzel v. Liberty Mutual Insurance Co.,* 508 F.2d 239, 246 (3d Cir.1975) (employees who left the employ of the Company more than 210 days before the filing of

charges with the EEOC not entitled to be members of class), *cert. denied,* 421 U.S. 1011, 95 S.Ct. 2415, 44 L.Ed.2d 679 (1975).

In the case of past employees, applying this principle is relatively easy. When an employee leaves the company, he or she has effectively severed the employment relationship, and computing the start of the actionable period in which he or she must bring the claim is easy. He or she has, in cases of federal employees, a period of days after he or she leaves the agency, prescribed by regulation, to bring a claim of discrimination based on the challenged employment practice. If no claim is filed, either by the discriminatee or by another employee as a class representative within the appropriate period, the claim is time-barred.

In employer-employee cases, the limitations period starts, notwithstanding the continuing violation, upon termination of the employer-employee relationship. The question in this case, where applicants are at issue, is as follows: does rejection of the application similarly sever the applicant-prospective employer relationship, so that the limitations period begins when applicant is rejected? The Court believes the answer should be in the affirmative. *Cf. Alvarez v. City of Philadelphia,* 98 F.R.D. 286, 290 (E.D.Pa.1983) (plaintiff who passed test and filed claim while list in effect, alleging that use of list based on discriminatory test constituted continuing violation, could not represent test-takers who failed); *Morris v. City of Pittsburgh,* 82 F.R.D. 74 (W.D.Pa.1979) (plaintiff could

---

**6.** The court in *Domingo* also stated that "[t]he continuing violation theory recognizes the principle that a plaintiff may be able to recover under Title VII if he or she can demonstrate a pattern or practice of discrimination that has continued into the present, notwithstanding his or her ability to prove specific instances of discrimination personally suffered at the hands of the defendant within the limitation period of Title VII." In addition to being inconsistent with the phrase quoted in the text above, a reading of the cases cited as support for the proposition that a plaintiff need not show harm during the actionable period indicates that the court did not intend to contravene the proposition that a plaintiff must show harm within the actionable period.

The first case cited by the court, *O'Brien v. Sky Chefs, Inc.,* 670 F.2d 864, 868 (9th Cir.1982), did not discuss any statute of limitations problems; the cited page only concerned the presumption that each personnel decision made during the period when discriminatory policy was in effect was also discriminatory. The second case cited, *Reed v. Lockhart,* 613 F.2d 757, 761–62 (9th Cir.1980) is consistent with this Court's view, because it held that plaintiff was alleging that she was being deprived of promotions into the actionable period by virtue of the discriminatory policy. *Id.* at 760 ("The violations of which she complains occurred each day of her employment, *including the days within the appropriate limitations period.*") (emphasis added).

represent applicants, but not those applicants whose claims were time barred).

The Court does not read *Roberts v. North American Rockwell Corp.*, 650 F.2d 823 (6th Cir.1981), to hold that a past applicant will never have his claim time-barred so long as the practice by which he or she was rejected remains in place. In *Roberts,* there was substantial evidence that Ms. Roberts sought the job which had been denied her into the charging period. Indeed, her formal application, which had been submitted outside the charging period, had not been formally rejected by the time she filed her charge. *See Roberts,* 650 F.2d at 824–25 (providing factual history of plaintiff's efforts to obtain employment); *id* at 827 ("Mrs. Roberts made a number of oral inquiries about her application, which was on file. This is empirical proof that she was, in effect, continually applying for a position at Rockwell—and being continually rejected because of her sex."); *id* at 827 (adopting as alternative holding that last oral denial, which was within charging period, was a separate discriminatory act, making the complaint timely). In light of the substantial proof that Ms. Roberts had continually sought employment from defendant, at least informally, it is hardly surprising that the court in that case did not require continuous formal applications.

In sum, those applicants who were rejected prior to the charging period (i.e., more than ninety days prior June 10, 1983) may not be members of the class. Such persons could recover for past discrimination only if they could show that they were aggrieved by the discriminatory policy within the charging period as part of an unsevered relationship with the employer. There being no evidence of the existence of any such individuals, the continuing violation theory has absolutely no effect upon the numerosity of the proposed class.

Plaintiffs find themselves in a position similar to their situation when the Court denied class certification initially in 1985. Deterred individuals are excluded. Applicants rejected for non-asthma reasons but who reported asthma are excluded. The continuing violation theory, inapplicable to rejected applicants, will not enlarge the class beyond the charging period. The 21 remaining members of the class proposed by plaintiffs, in this Court's view, do not require common adjudication on a class basis. In essence, there is no "class" as contemplated by Rule 23.

**B.** *No Class Member Has Taken Timely Administrative Action*

As an alternative ground for denying class certification, the Court finds that no representative of the putative class, nor indeed *any* class member as the Court has delimited it, has timely contacted an EEO officer and pursued administrative relief as required by regulation.

█ Only Rodriguez took such action. Rodriguez is not a rejected applicant within the proposed class, because any claim based upon his original rejection is time-barred. As the reasoning immediately above compels, the continuing violation theory will not revive his stale 1982 claim. Once rejected in 1982, Rodriguez' relationship with the Department was severed most certainly when, in October of that year, he started a two-year automotive technician course which he completed in summer of 1984. This is similar to accepting other employment and indicates that he had abandoned, at least temporarily, his efforts to obtain a U.D. position. Rodriguez cannot, therefore, benefit from the continuing violation theory to maintain an action based upon his earlier rejection. The 1982 discrimination had concluded. The 1983 phone call, if an act of discrimination at all, was a new act. Although Rodriguez might show discrimination within the actionable period, he is unable to show the requisite continuing relationship. If anything, his claim lies in the possibility that his 1983 telephone conversation with the U.S. deterred a second application. Whether he can make out such a case is another question.

Thus, Rodriguez falls within the category of individuals "deterred" from applying for employment with the Service. As this group has been excluded from the class,

the remaining class members cannot rely upon his exhaustion of administrative remedies, assuming that procedure was itself timely. Lacking a class member who initiated timely EEO action, the class cannot be certified.

### III. CONCLUSION

For the reasons outlined above, the Court declines to include within the class the sub-groups of individuals deterred from applying, those reporting asthma but rejected for other reasons, and those rejected prior to the charging period. Plaintiffs have identified only 21 individuals clearly rejected on the basis of asthma within the charging period. This group fails to meet the numerosity requirement of Rule 23. Alternatively, the class so-defined presents no member who initiated and pursued timely administrative remedies. Although plaintiff Rodriguez may have followed appropriate administrative procedures, he falls within a sub-group the Court has excluded from the class. As a result, plaintiffs' motion for class certification must be denied.

An appropriate Order accompanies this Memorandum.

Patrick J. Christmas, Washington, D.C., for plaintiff.